IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
Eastern Division Akron

**FILED**

NOV 01 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

| | |
|---|---|
| **DERRICK M. KING** | Case No. **5:23-cv-02042-PAB** |
| Plaintiff | Judge **PAMELA A. BARKER** |
| vs. | *Magistrate Judge Jennifer Dowdell Anderson* |
| **PHILIPS NORTH AMERICA LLC; PHILIPS HOLDING USA INC; PHILIPS RS NORTH AMERICA INC; PHILIPS RS NORTH AMERICA HOLDING CORPORATION; KONINKLIJKE PHILIPS N.V.; POLYMER TECHNOLOGIES INC.; and POLYMER MOLDED PRODUCTS LLC** | |
| Defendants | |

## <u>PLAINTIFF DERRICK MARTIN KING'S FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES AND MONETARY DAMAGES</u>

## TABLE OF CONTENTS

TABLE OF EXHIBITS.................................................................................................. v

PRELIMINARY STATEMENT.................................................................................. 1

PARTIES.................................................................................................................... 7

I.    PLAINTIFF............................................................................................................. 7

II.   DEFENDANTS....................................................................................................... 7

      A.    The Philips Defendants.................................................................7

      B.    The Other Defendants ....................................................................9

JURISDICTION AND VENUE ................................................................................. 10

FACTUAL ALLEGATIONS...................................................................................... 11

I.    CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED
      TO TREAT BREATHING DISORDERS........................................................ 11

II.   THE EVOLUTION OF CPAP, BIPAP, AND VENTILATOR DEVICES
      CONTAINING PE-PUR FOAM. ........................................................................ 13

III.  PHILIPS' USE OF PE-PUR FOAM POSES SERIOUS HEALTH RISKS TO
      USERS OF ITS RECALLED DEVICES. ....................................................... 20

      A.    Formaldehyde is a Known Carcinogen. ........................................24

      B.    Toluene Diisocyanate is a Likely Carcinogen. ..............................25

      C.    Toluene Diamine is a Likely Carcinogen.......................................26

      D.    Diethylene Glycol is Toxic to Humans...........................................27

      E.    Dimethyl Diazine is a Precursor to a Known Carcinogen..............28

IV.   PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM FOR MANY
      YEARS PRIOR TO THE RECALL. .................................................................. 30

      A.    In 2015, Philips Communicated with its Foam Suppliers About
            the problem of PE-PUR Foam Degradation...................................33

      B.    Philips Opened an Internal Investigation into Foam
            Degradation in Mid-2018 that Confirmed PE-PUR Foam is
            Prone to Degradation.....................................................................36

C.      Philips Finally Opened a Formal CAPA in 2019 – But Did Not Initiate a Recall for Two More Years. ............................................. 40

V.     PHILIPS CONSISTENTLY MARKETED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE EVEN WHEN IT KNEW OF THE PROBLEMS WITH PE-PUR FOAM DEGRADATION AND ASSOCIATED HEALTH RISKS. ................................................................................................. 42

A.      Philips Never Hinted at the Dangerous Condition of the Recalled Devices. ........................................................................ 42

B.      Philips Sold its Humidifier Accessory Allowing Warm Storage Conditions and Contributing to Humidity of the Foam. ................... 43

VI.    PHILIPS FINALLY RECALLED ITS DEFECTIVE DEVICES CONTAINING HAZARDOUS PE-PUR FOAM, BUT ONLY AFTER LAUNCHING ITS NEWEST DEVICE WITHOUT PE-PUR FOAM. ................................................. 44

A.      Prior to the Recall, in April and May 2021, Philips Launched the DreamStation 2 (which does not contain PE-PUR foam). ........ 44

B.      Testing Continued to Confirm the Recalled Devices were Defective and the FDA received additional MDRs. ........................ 45

C.      Finally, in June 2021, Philips Recalled its Defective Devices. ....... 46

VII.   THE MEASURES TAKEN BY PHILIPS TO RECALL THE DEFECTIVE DEVICES WERE INEFFECTIVE. ....................................................................... 49

A.      Many Patients, Providers, and Others Were Not Notified About the Recall. ........................................................................ 49

B.      Philips' Repair/Replacement Program Has Been Extremely Slow. ................................................................................................. 50

THE PERSONAL INJURIES SUSTAINED BY PLAINTIFF AS A DIRECT AND PROXIMATE CAUSE OF SUSTAINED USE OF A RECALLED DEVICE ................... 53

EQUITABLE TOLLING OF STATUTE OF LIMITATIONS. ........................................... 55

CAUSES OF ACTION. ................................................................................................. 55

I.      STRICT LIABILITY—DESIGN DEFECT. ........................................................... 55

II.     STRICT LIABILITY—FAILURE TO WARN. ........................................................ 57

III.   STRICT LIABILITY—MANUFACTURING DEFECT. .......................................... 60

IV.    GENERAL NEGLIGENCE. ...................................................... 61

V.    NEGLIGENT FAILURE TO WARN. ........................................... 63

VI.    NEGLIGENT RECALL/NEGLIGENT FAILURE TO RECALL ............................ 65

VII.    BREACH OF EXPRESS WARRANTY. ..................................... 67

VIII.    BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY. ............... 68

IX.    VIOLATION OF 15 U.S.C. § 2301, THE MAGNUSON-MOSS FEDERAL WARRANTY ACT. ................................................................. 69

X.    COMMON LAW FRAUD. ........................................................ 71

XI.    VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE CHAPTER 1345. ........................................ 73

XII.    VIOLATIONS OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ("RICO") ACT. ......................................... 73

    A.    The Philips-Polytech Enterprise was an Association-In-Fact Enterprise with a Common Purpose to Conceal the Health and Safety Risks of the Recalled Devices. ............................74

    B.    The Philips-PolyTech Enterprise had a Common Purpose. ...........75

    C.    The Philips-PolyTech Enterprise had an Ongoing Organization. ...............................................................77

    D.    The RICO Defendants Committed at least Two Predicate Acts of Mail and Wire Fraud in Furtherance of the Enterprise's Fraudulent Scheme. ........................................................80

    E.    The RICO Defendants Advanced their Fraudulent Scheme by Concealing Material Information about Serious Safety Risks Posed by the Recalled Devices that They Had a Duty to Disclose: ..........................................................87

    F.    The Philips-PolyTech Enterprise's Pattern of Rackerteering Injured Plaintiff in their Business or Property When They Paid for the Defective Recalled Devices. ...............................89

XIII.    VIOLATIONS OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ("RICO") ACT, ..................................... 91

XIV.    BATTERY. ........................................................................ 93

iii

XV.    PUNITIVE DAMAGES. ........................................................................................ 94

**PRAYER FOR RELIEF** ............................................................................................ 95

**JURY DEMAND** .................................................................................................... 95

**CERTIFICATE OF SERVICE** ................................................................................... 96

**PRAECIPE TO THE CLERK OF COURTS** ............................................................... 97

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION OF EXHIBIT |
|---|---|
| 1 | Koninklijke Philips. *Urgent Medical Device Recall* (June 14, 2021). |
| 2 | U.S. Food and Drug Administration. *FDA-483 Report* (November 9, 2021). Redacted version available online at https://www.fda.gov/media/154244/download (last accessed Oct. 31, 2023). |
| 3 | Koninklijke Philips, *Sleep and Respiratory Care update: Clinical Information for Physicians* (June 14, 2021). Available online at www.philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Oct. 31, 2023). |
| 4 | U.S. Food and Drug Administration, *Philips Respironics Recalls Certain Ventilators and BiPAP Machines Due to Potential Health Risks from PE-PUR Sound Abatement Foam* (July 22, 2021). Available online at https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-ventilators-and-bipap-machines-due-potential-health-risks-pe-pur (last accessed Oct. 31, 2023). |
| 5 | Koninklijke Philips. *Philips Respironics DreamStation Sound Performance* (2016) |
| 6 | U.S. Food and Drug Administration, *FDA 518(a) Notice sent to Philips Respironics* (March 10, 2022). Available online at https://www.fda.gov/media/156811/download?attachment (last accessed Oct. 31, 2023). |
| 7 | U.S. Food and Drug Administration, *FDA 518(b) Notice of Opportunity for a Hearing* (May 2, 2023). Available online at https://www.fda.gov/media/158129/download (last accessed Oct. 30, 2023). |
| 8 | International Agency for the Research of Cancer, *Formaldehyde*. IARC Monograph 100F (December 21, 2021). Available online at https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono100F-29.pdf (last accessed Oct. 31, 2023). |
| 9 | U.S. Department of Health and Human Services, National Toxicology Program. *Formaldehyde,* 15th Report on Carcinogens (December 21, 2021) |
| 10 | Koninklijke Philips, *Sleep and Respiratory Care update: Clinical Information for Physicians* (July 8, 2021). |
| 11 | International Agency on Cancer Research. *Toluene diisocyanates*. IARC Monograph 71 (December 21, 2022). Available online at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Oct. 31, 2023). |
| 12 | U.S. Department of Health and Human Services National Toxicology Program. *Toluene diisocyanates,* 15th Report on Carcinogens |

| | |
|---|---|
| | (December 21, 2021). Available online at https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/toluen ediisocyanates.pdf (last accessed Oct. 31, 2023). |
| 13 | U.S. Centers for Disease Control, National Institute for Occupational Safety and Health, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.* Current Intelligence Bulletin 53: NIOSH Pub. No. 90-101(Dec. 1989). Available online at https://www.cdc.gov/niosh/docs/90-101/default.html (last accessed Oct. 31, 2023). |
| 14 | U.S. Environmental Protection Agency. *Fact Sheet: Toluene Diisocyanate (TDI) and Related Compounds* (last updated March 7, 2023) |
| 15 | U.S. Department of Health and Human Services, National Toxicology Program. *Toluene diisocyanates.* 15th Report on Carcinogens (December 21, 2021). Available online at https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/toluen ediisocyanates.pdf (last accessed Oct. 31, 2023). |
| 16 | U.S. Department of Health and Human Services, National Toxicology Program. *2,4-Diaminotoluene.* 15th Report on Carcinogens (Dec. 21, 2021). Available online at https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/diamin otoluene.pdf (last accessed Oct 31, 2023). |
| 17 | U.S. Food and Drug Administration. *Sulfanilamide Disaster.* FDA Consumer Magazine (July 1981). Available online at https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf (last accessed Oct. 31, 2023). |
| 18 | April 1, 2022 Affidavit of Lee F. Lawler and selected exhibits (filed in the case of *In re: Philips CPAP, Bi-PAP, and Ventilator Products Liability Litigation,* MDL-3014, ECF No. 589 (W.D. Pa.)) |
| 19 | Koninklijke Philips. *Philips Respironics DreamStation CPAP Device User Manual* (2016). |
| 20 | April 4, 2018 Cornerstone Medical Delivery Ticket |

Now comes the *pro se* Plaintiff **DERRICK M. KING,** and he submits this First Amended Complaint against Defendants **PHILIPS NORTH AMERICA LLC, PHILIPS HOLDING USA INC, PHILIPS RS NORTH AMERICA, PHILIPS NORTH AMERICA HOLDING CORPORATION, KONINKLIJKE PHILIPS N.V.; POLYMER TECHNOLOGIES INC,** and **POLYMER MOLDED PRODUCTS LLC.** Plaintiff alleges the following:

## **PRELIMINARY STATEMENT**

1.  Defendant Koninklijke Philips N.V. ("Royal Philips") is a Dutch multinational company that is the global head of the "Philips" enterprise, which bills itself as "a diverse team made up of some 80,000 individuals across over 100 countries, all with different backgrounds, perspectives and experiences." *See* Royal Philips "About us" webpage, available online at https://www.philips.com/a-w/about.html (last accessed Oct. 15, 2023). Royal Philips controls and oversees all aspects of the Philips businesses around the world, going to great lengths to ensure there is a unity of purpose and vision, consistent execution of company procedures, policies, and goals, and, importantly, maintenance and protection of the valuable "Philips" brand. In addition to Royal Philips, Defendants, Philips North America LLC ("Philips NA"), Philips Holding USA Inc. ("Philips USA"), Philips RS North America LLC ("Philips RS"), and Philips RS North America Holding Corporation ("Philips RS Holding") are essential parts of the Philips family that, along with other Philips' entities, engaged in the wrongful conduct at issue in this litigation. These Defendants are referred to collectively herein as "Philips" or the "Philips Defendants." At all relevant times, each Philips Defendant acted in all aspects as the agent and alter ego of one another, and references to "Philips" refer to each Philips Defendant individually and collectively.

2.  Royal Philips boasts on its website www.philips.com (last accessed Oct. 15, 2023) that "Over the past decade we have transformed into a focused leader in health technology.... At Philips, our purpose is to improve people's health and well-being through meaningful innovation." *Id.* As part of that business, Philips manufactures and sells certain lines of products that are intended to help people breathe. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and mechanical ventilators ("ventilators"), which treat respiratory failure. The primary function of these devices is to blow air into patients' airways. CPAP and BiPAP machines are intended for use during sleep while ventilators are used continuously when needed.

1

3.  Because these machines are used during sleep, Philips designed them to include sound-dampening foam intended to reduce noise emitted from the motors in the devices. Unfortunately, Philips designed its devices to include polyester-based polyurethane ("PE-PUR") foam, which Philips knew for many years, among other things, is susceptible to hydrolysis, the chemical breakdown of a compound due to reaction with water, particularly in medical applications. This can result in degradation of the foam and off-gassing of volatile organic compounds ("VOCs").

4.  On June 14, 2021, Philips, through multiple of its entities, including Royal Philips and Philips RS, announced a recall of approximately 11 million of its CPAP and BiPAP machines and ventilators in the United States that were manufactured with PE-PUR foam from 2008 until April 26, 2021. A copy of the Philips Respironics Medical Device Recall is annexed hereto and marked as Exhibit 1. All of these recalled products (individually referred to herein as a "Recalled Device," or collectively, as the "Recalled Devices") are defective because they contain PE-PUR foam.

5.  The Recalled Devices include the following Philips Respironics devices:

| PHILIPS RESPIRONICS MEDICAL DEVICE MODEL NAME | TYPE OF MEDICAL DEVICE |
| --- | --- |
| E30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| A-Series BiPAP Hybird A30 (not marketed in the United States) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| A-Series BiPAP V30 Auto | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation SV, AVAPS | Continuous Ventilator, Non-life Supporting |
| SystemOne ASV4 | Continuous Ventilator, Non-life Supporting |
| C-Series S/V and AVAPS | Continuous Ventilator, Non-life Supporting |
| OmniLab Advanced | Continuous Ventilator, Non-life Supporting |
| A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |

2

| A-Series BiPAP A30 | Continuous Ventilator, Non-life Supporting |
| SystemOne (Q-Series) | Noncontinuous Ventilator |
| DreamStation | Noncontinuous Ventilator |
| DreamStation Go | Noncontinuous Ventilator |
| Dorma 400 | Noncontinuous Ventilator |
| Dorma 500 | Noncontinuous Ventilator |
| REMstar SE Auto | Noncontinuous Ventilator |
| Trilogy 100 | Continuous Ventilator |
| Trilogy 200 | Continuous Ventilator |
| Garbin Plus, Aeris, LifeVent | Continuous Ventilator |

6. The use of PE-PUR foam in the Recalled Devices is a defect because the foam is susceptible to breaking down into particles which may then be inhaled or ingested by the user, and may emit VOCs that can also be inhaled, resulting in "serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.

7. Philips was aware of problems with the PE-PUR foam in the Recalled Devices dating as far back as 2008 when it began receiving numerous complaints from customers including complaints containing the keywords "contaminants, particles, foam, debris, airway, particulate, airpath, and black." *See* Exhibit 2, at 12. A 483 Report from the Food and Drug Administration ("FDA") "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts." FDA webpage, *FDA Form 483 Frequently Asked Questions,* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed Oct. 3, 2023).In addition, beginning as far back as 2015, Philips conducted and received multiple test reports and additional data confirming that the Recalled Devices pose serious, indeed life-threatening, health risks to users, but Philips failed to timely disclose that they were defective when manufactured and sold.

8. Instead of instituting a recall immediately, Philips waited until June 2021 to issue the Recall and notify the public about the dangers of the Recalled Devices, continuing to sell defective devices and leaving users to breathe in the toxic fumes and risk serious injury. In its Recall, Philips publicly announced that the PE-PUR foam may break down into particles and be inhaled or ingested, and may emit

3

VOCs that can be inhaled, resulting in "serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment" (referred to herein as the "Defect"). *Id.* Philips stated that the potential risks of exposure due to such chemicals include "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects." *Id.* Philips' announcement to doctors advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment." *See* Koninklijke Philips, *Sleep and Respiratory Care update: Clinical Information for Physicians* (June 14, 2021), at 2, available online at www.philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Oct. 3, 2022) (attached herein and marked as Exhibit 3)

9.    In addition, on July 22, 2021, the U.S. Food and Drug Administration ("FDA") confirmed the severity of the issues described in the Recall and classified the Recall as Class I or "the most serious type of recall," meaning use of the Recalled Devices "may cause serious injuries or death." *See* Exhibit 4.

10.   As noted above, Philips knew about the serious risks caused by the Recalled Devices long before the Recall.

11.   On November 9, 2021, the FDA issued a report detailing the findings of an FDA investigation, findings that demonstrate Philips knew that the PE-PUR foam degraded into hazardous substances. *See* Exhibit 2. The FDA discovered emails, dating back to October 2015, to Philips from the supplier of the raw foam used to make the PE-PUR foam in the Recalled Devices regarding PE-PUR foam degradation issues. *Id.* Additionally, the FDA found that, in November 2015, Philips engaged in preventative maintenance on certain Recalled Devices in response to PE-PUR foam degradation issues and complaints, yet failed to conduct any "further investigation, health hazard evaluation, risk analysis, or design review" on any of the Recalled Devices that use the same PE- PUR foam. *Id.* at 2. To be sure, the FDA found that "there were at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions." *Id.* at 3. This is in addition to the detailed customer complaints that existed as far back as 2008 and the additional data Philips collected in 2015.

12.   Despite knowing about the degradation and off-gassing problems with the PE-PUR foam and the associated health risks for users of

the affected devices, Philips failed until many years later to disclose the Defect to consumers, hospitals, institutions, doctors, and suppliers, continuing to sell the defective products and allowing patients to use the defective products. In addition, Defendant Polymer Technologies, Inc. ("PolyTech"), a supplier of PE-PUR foam to Philips, worked with Philips to conceal these key facts from consumers so that both could continue to profit from the sales of these defective devices.

13.     It was only after Philips launched its next generation of CPAP/BiPAP machines (the DreamStation 2 devices), machines that do not contain PE-PUR foam and could serve as a replacement for Recalled Devices, that Philips finally disclosed that its Recalled Devices were defective. That is, on April 26, 2021, Philips announced that its previous generation DreamStation products and other CPAP, BiPAP, and ventilator devices posed serious health risks to users. Philips then waited an additional seven weeks before initiating the Recall of the dangerously defective machines in the United States. Shortly thereafter, Philips expanded its recall of defective CPAP, BiPAP, and ventilator devices worldwide. *See, e.g.,* Koninklijke Philips website, *Urgent Product Defect Correction in Australia (Recall for Product Correction in New Zealand)*, available online at https://www.philips.com.au/healthcare/e/sleep/communications/src-update (last accessed Oct. 10, 2023) (stating that a global recall notification was issued on June 14, 2021 and that recalls specific to Australia and New Zealand were issued on July 2, 2021). As discussed, *infra*, other impacted countries include, but are not limited to Canada, Israel, and Chile.

14.     Because of the increased demand for safe and effective CPAP, BiPAP, and ventilator devices at the time of the Recall, replacement machines were difficult to find and expensive, a situation that was exacerbated by a shortage of microchips for these devices. Thus, many users were forced into a Hobson's choice – continue using their Recalled Devices and expose themselves to risks of serious injury or death or stop using their breathing devices and risk health consequences from their underlying conditions.

15.     When the Recall was first announced on June 14, 2021, Philips did not offer users of the Recalled Devices any option for a replacement device.

16.     On September 1, 2021, Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States, and initially, Philips estimated that it would take a year to complete the program. *See*

Royal Philips Press Release, Philips starts repair and/or replacement program of first- generation DreamStation devices in the US and other markets (Sept. 1, 2021), available online at https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210901-philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-in-    relation-to-earlier-announced-recall-notification.html (last accessed Oct. 10, 2023); *see also* Philips "Ventilation News and Updates" webpage, Trilogy Remediation Update for Business Customers (June 1, 2022), available online at https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/ventilation-news-and-updates (last accessed Oct. 10, 2023).

17.    In announcing the repair/replacement program, Royal Philips CEO Frans van Houten acknowledged that patients using Recalled Devices needed a solution and that delayed relief for them presented a problem: "We fully recognize that the timeframe for remediation of the affected devices places patients in a difficult situation." *Id.*

18.    Unfortunately for users of the recalled DreamStation devices, the repair and replacement program were negligently implemented and ineffective. DreamStation customers were not given any specifics as to how the replacement program would work nor were they told when they might receive a replacement device (a significant factor for users who relied on the machines for medical conditions). Nor did Philips provide meaningful guidance to DreamStation customers' treating physicians. In addition, the repair and/or replacement program was limited in that it only impacted DreamStation Recalled Devices and not any other Recalled Device.

19.    As noted, the Recalled Devices were intended to be used to help users breathe. But, the degradation and off-gassing of the PE-PUR foam rendered the Recalled Devices defective and unsafe, and not fit for their intended purpose. Each of the Plaintiff used the Recalled Devices and would not have done so had they known that the PE-PUR foam in the Recalled Devices could expose them to life-threatening injuries or cause serious health problems, but instead would have sought alternative means to treat their conditions.

20.    Plaintiff, who was injured by Defendants' misconduct, seek to recover damages resulting from Defendants wrongful conduct, including: (a) designing a defective product that caused serious injuries to users, (b) failing to warn about serious, and reasonably foreseeable health risks caused by the Recalled Devices, (c)

engaging in the deliberate concealment, misrepresentation and obstruction of public and regulatory awareness of serious health risks to users of the Recalled Devices, and (d) failing to utilize reasonable care in, among other things, designing, manufacturing, marketing, selling, distributing, and recalling (or failing to timely recall) the Recalled Devices.

## PARTIES

I.  PLAINTIFF.

21.  Plaintiff is an adult resident of Akron, Ohio and has suffered injuries from the use of a Recalled Device.

22.  As a direct and proximate cause of the use of a Recalled Device, Plaintiff has been diagnosed with severe aortic stenosis and has undergone open heart surgery.

23.  Plaintiff would not have paid for, purchased, leased, or otherwise acquired the Recalled Device had he known that the PE-PUR foam in the Recalled Device could expose users to life-threatening injuries or cause serious health problems, rendering the Recalled Device defective, unsafe, worthless, and not fit for its intended purpose. As a result, Plaintiff have suffered additional economic harm including, but not limited to: (a) the difference between the values of the Recalled Devices as represented (their prices paid) and their actual values at the time of purchase or lease ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages.

24.  As a proximate result of Philips' wrongful conduct, Plaintiff have been severely harmed; and have endured pain, suffering, disability, impairment, disfigurement, cancer diagnoses and/or an increased risk of developing cancer and/or other serious illnesses, loss of enjoyment of life, aggravation or activation of preexisting conditions, scarring, and/or inconvenience; and incurred costs for a defective device, medical care and treatment, loss of wages and wage-earning capacity, death for certain patients, and other economic and non-economic damages. The losses are permanent and continuing in nature.

II.  DEFENDANTS.

A.  The Philips Defendants.

25.  Defendant Royal Philips is a Dutch multinational publicly traded company having its principal executive offices at Philips Center,

7

Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the ultimate parent company of the Philips Group of healthcare technology businesses including Connected Care businesses focusing on Sleep & Respiratory Care. *See* Royal Philips Press Release, Philips realigns the composition of its reporting segments (Jan. 10, 2019), available online at https://www.philips.com/a-w/about/news/archive/standard/news/press/2019/20190110-philips-realigns-the-composition-of-its-reporting-segments.html (last accessed Oct. 8, 2022) "The Company, which started as a limited partnership with the name Philips & Co in Eindhoven, the Netherlands, in 1891, was converted into the company with limited liability N.V. Philips' Gloeilampenfabrieken on September 11, 1912. The Company's name was changed to Philips Electronics N.V. on May 6, 1994, and then to Koninklijke Philips Electronics N.V. on April 1, 1998, and [finally] to Koninklijke Philips N.V. on May 15, 2013." Royal Philips' shares have been listed on the Amsterdam stock exchange since 1912, have been traded in the United States since 1962, and have been listed on the New York Stock exchange since 1987. Royal Philips 2017 Annual Report, at 84 (all quarterly and annual reports and SEC 20-F filings from 2009 to the present can be found online at https://www.results.philips.com/publications/ar21 (last accessed Oct. 3, 2023) under the "All Results" tab .Royal Philips holds directly or indirectly 100% of its subsidiaries, Philips NA, Philips USA, Philips RS Holding, and Philips RS. As such, Royal Philips controls Philips NA and Philips RS with respect to the manufacturing, selling, distributing, and supplying of the Recalled Devices. Royal Philips is the parent company of Philips NA and Philips RS. Royal Philips can be served with process via the *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* ("Hague Service Convention").

26.    Defendant Philips NA is a Delaware company that was incorporated on August 6, 1987, having its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA was "formerly known as Philips Electronics North America Corporation." Philips NA is a wholly-owned subsidiary of Royal Philips, managed by Philips USA, and is considered to be a citizen of Delaware and Massachusetts. Philips NA can be served through its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware 19808-1674.

27.    Defendant Philips USA is a Delaware corporation that was incorporated on July 18, 1995, having its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips USA is a holding company that is 100% owned, directly or indirectly, by Royal Philips. Philips USA manages the operations of

Royal Philips' various lines of business including Philips RS Holding and through it, Philips RS. Philips USA is also the member/manager of Philips NA. Philips USA is a citizen of Delaware and Massachusetts can be served through its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware 19808-1674.

28. Defendant Philips RS is a Delaware company that was incorporated on February 22, 1984, having its principal place of business at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Upon information and belief, Philips RS is 100% owned by Philips RS Holding, which in turn, is 100% owned by Philips USA. Philips RS formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008, creating "Philips Respironics." *See* Foo Yun Chee & Niclas Mika, "Philips in $5 billion Respironics, Reuters (Dec. 21, 2007), available online at https://www.reuters.com/article/us-philips/philips-in-5-billion-respironics-deal-idUSL2131786820071221 (last accessed Oct. 21, 2023). Upon information and belief, Philips Respironics is a fictitious name that is 100% owned by Philips RS [N]orth America LLC." In October 2020, shortly before the Recall, Respironics, Inc. was newly registered under the name Philips RS North America, LLC. Philips RS is a citizen of Delaware and Pennsylvania and can be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808-1674.

29. Defendant Philips RS Holding is a Delaware corporation that was incorporated on October 31, 2020, having its principal place of business at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by Philips USA. Philips RS Holding is a citizen of Delaware and Massachusetts and can be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808-1674.

B.  The Other Defendants

30. Defendant Polymer Technologies, Inc. ("PolyTech") is a Delaware corporation with its principal place of business at 420 Corporate Boulevard, Newark, Delaware 19702. PolyTech directly or through another intermediary provided Philips with the PE-PUR foam that was used in the Recalled Devices. PolyTech is considered to be a citizen of Delaware and Massachusetts.

31. Defendant Polymer Molded Products LLC ("PMP") is a New Jersey limited liability company with its principal place of business at 10 Easy Street, Bound Brook, NJ 08805-1147. PMP is a molded

9

polyurethane foam manufacturer. PMP directly or through another intermediary provided Philips with the PE-PUR foam that was used in the Recalled Devices. PMP is considered to be a citizen of New Jersey. PMP may be served through its registered agent Benjamin Prybutok at 3 Horseshoe Drive, Mount Laurel, New Jersey 08054-3055.

32.    At all relevant times, Defendants PolyTech and PMP acted in all respects as the agent and alter ego of one another, and reference hereinafter to "PolyTech" or the "PolyTech Defendants" refers to Defendants PolyTech and PMP individually and collectively.

## JURISDICTION AND VENUE

33.    This Court has subject matter jurisdiction over the federal claims asserted herein under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. The Court further has jurisdiction under 28 U.S.C. § 1331 for the RICO and Magnuson-Moss Warranty claims and under 28 U.S.C. § 2310(d) for the Magnuson-Moss Warranty claims.

34.    Plaintiff is a citizen of Ohio

35.    Royal Philips is a citizen of The Netherlands.

36.    Philips NA are citizens of Delaware and Massachusetts.

37.    Philips Holding are citizens of Delaware and Massachusetts.

38.    Philips USA are citizens of Delaware and Massachusetts.

39.    Philips RS are citizens of Delaware and Massachusetts.

40.    Philips RS Holding are citizens of Delaware and Massachusetts.

41.    PolyTech is a citizen of Delaware.

42.    PMP is a citizen of New Jersey.

43.    Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff's injuries giving rise to the claim occurred in this District.

**FACTUAL ALLEGATIONS**

I.    CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED TO TREAT BREATHING DISORDERS.

44.    Sleep apnea is a sleeping disorder in which breathing is disturbed during sleep. These disturbances are called "apneas."

45.    According to the Mayo Clinic, the main types of sleep apnea are obstructive sleep apnea, central sleep apnea, and complex sleep apnea syndrome (also known as treatment-emergent central sleep apnea).

46.    Obstructive sleep apnea is the most common type. It occurs when the muscles in the back of the throat relax during inhalation, which causes the airway to narrow or close and prevent sufficient air from passing through. This, in turn, lowers the oxygen level in the blood, which causes the brain to briefly wake the body from sleep to reopen the airway. This reawakening may be so brief that the patient does not remember it, and may be associated with snorting, choking, or gasping. It can happen anywhere from a few times per hour to once every few minutes, and can prevent the patient from reaching the deep, restful phases of sleep.

47.    Central sleep apnea occurs when the brain fails to transmit signals to the breathing muscles. As a result, the body stops breathing, which can cause waking with shortness of breath or difficulty getting to sleep or staying asleep.

48.    Complex sleep apnea syndrome occurs when a patient has both obstructive sleep apnea and central sleep apnea. An image showing how an airway can be blocked as a result of sleep apnea appears below:

11



49.    CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. The illustration below shows a generic CPAP machine being used by a patient while sleeping.



50.    Another therapy to treat sleep apnea includes use of BiPAP machines, which use two different pressures – one for inhaling and one for exhaling.

12

51.    Patients customarily place the CPAP or BiPAP machines on a nearby nightstand or shelf. A hose connects the unit to the mask, which is worn over the nose or mouth during sleep. Below is an image of a Philips DreamStation machine on a nightstand.



52.    Ventilators are often used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows, typically through a tube that is connected to the machine on one end and inserted through the patient's nose or mouth into the trachea on the other end. Patients are typically sedated while on ventilation because it can otherwise cause intense pain. Ventilators can also be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. There are also ventilators for home use. The following image from the National Institute of Health ("NIH") shows a typical ventilator and how it works:



II.    THE EVOLUTION OF CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING PE-PUR FOAM.

53.    The basic technology used in CPAP and BiPAP devices was developed in 1980 by an Australian pulmonologist, Dr. Colin Sullivan, who used it to treat dogs with respiratory problems, before the technology was adapted for humans.

54.    Respironics commercialized this technology and sold the first publicly available CPAP device in 1985. ResMed, an industry competitor, followed with the release of its CPAP device in 1989.

55.    These first-generation CPAP and BiPAP devices created a new and commercially viable field of respiratory therapy. · The devices, however, were large and noisy, resulting in an "arms-race" between manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and quieter.

56.    The noise level of CPAP and BiPAP devices became a driver of adult consumer preference because loud devices interrupt the peaceful sleep of both the patient and their partner.

57.    To develop the quietest devices on the market with the lowest decibel ratings, some device manufacturers including Philips swathed the CPAP, BiPAP, and ventilator devices with sound abating foam to reduce the volume of noise emitted from the devices.

58.    In fact, the alleged relative quiet nature of the DreamStation products with PE-PUR foam factored prominently into Philips' marketing. *See* Koninklijke Philips N.V., *Philips Respironics DreamStation: Rediscovering dreams* (2016) (annexed herein and marked as Exhibit 5). Philips represented that it extensively studied and measured the amount of sound produced by DreamStation products.



Philips even included an infographic indicating DreamStation products are barely louder than a whisper. Id., at 3.

59.    Other manufacturers did not utilize foam for sound abatement, instead they utilized silencing technology to abate the sound from the devices.

60.    Philips manufactures and sells CPAP and BiPAP machines and ventilators, among other products. According to Royal Philips' 2020 Annual Report, Sleep & Respiratory Care constituted 49% of its total sales in its Connected Care line of business, which, in turn, accounted for 28% of Royal Philips' overall sales of about € 19.535

billion. Philips has sold millions of CPAP, BiPAP, and ventilator devices in the United States and elsewhere throughout the globe. Koninklijke Philips N.V., *Philips 2020 Annual Report: Innovating to address global health challenges* (Feb. 23, 2021). Available online at https://www.results.philips.com/publications/ar20?type=annual-report&origin=2_us_en_5250933_Microsoft+Shopping+%28Bing+R ebates%2C+Coupons%2C+etc.%29_mixedtype_cj&utm_source=5 250933&utm_medium=affiliate&utm_campaign=cj&cjevent=ec08e4 671a4811ed838f01650a82b821&utm_term=Microsoft+Shopping+% 28Bing+Rebat es%2C+Coupons%2C+etc.%29&cjdata=MXxOfDB8WXww

61.     Philips provides a User Manual with its CPAP, BiPAP, and ventilator devices. Royal Philips owns the copyright to all, or most, of those User Manuals. See Koninklijke Philips. *DreamStation User Manual,* dated 2016 (a copy is annexed herein and marked as Exhibit 5).

62.     Philips made the decision to use PE-PUR foam for sound abatement purposes in its CPAP, BiPAP, and ventilator devices. That decision was made for products distributed by Philips' entities throughout the globe including, but not limited to the United States, Australia, Canada, Israel, and Chile. *See* Koninklijke Philips N.V., *Philips Q2 2022 Quarterly Report,* at p. 33 (Jul. 25, 2022). Available online at https://www.results.philips.com/publications/q222/downloads/pdf/en /philips-second-quarter-results-2022-report.pdf?v=20230725135335 (last accessed Aug. 29, 2023).

63.     Polyurethane is an organic polymer in which urethane groups connect the molecular units and is usually formed by reacting a diisocyanate or triisocyanate with a polyol. Under certain circumstances, polyurethane may break down into a diisocyanate or triisocyanate.

64.     The two main types of polyurethane are polyester and polyether. Polyester polyurethane has better shock absorption and vibration dampening properties and is commonly used for soundproofing or sound dampening.

65.     It has been known for decades that polyester polyurethane is susceptible to hydrolysis, the chemical breakdown of a compound due to reaction with water, particularly in medical applications. For example, a chapter of a scientific encyclopedia published in 2013 states: "Poly(ester urethanes) were the first generation of PURs used in medical devices but were found unsuitable for long-term implants because of rapid hydrolysis of the polyester soft segment[.]" N. Pal Singh Chauhan and N. Kumari Jangid. *Polyurethanes and Silicone*

*Polyurethane Copolymers.* Chapter in Encyclopedia of Biomedical Polymers and Polymeric Biomaterials (Jan. 2013). Available online at https://www.researchgate.net/publication/236144965_POLYURETH ANES_AND_SILICONE__POLYURETHANE_COPOLYMERS (last accessed Aug. 12, 2022).

66.    Polyether polyurethane, on the other hand, is less prone to hydrolysis. The same scientific encyclopedia chapter notes that polyether polyurethanes "with excellent hydrolytic stability replaced poly(ester urethanes) and have been used in medical devices for the past two decades." *Id.*

67.    There were readily available alternative designs available to Philips, other than to use PE-PUR foam in CPAP, BiPAP, and ventilators for sound abatement; including, without limitation, other types of sound abating foam and silencing technologies that do not use foam.

68.    For example, Philips' principal competitor, ResMed, uses polyether polyurethane foam or silicone-based foam, not PE-PUR foam, for sound dampening. ResMed (Updated Dec. 6, 2021). *Information regarding Philips' recall.* Available online at https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Sept. 1, 2023).

69.    Defendants obtained 510(k) clearance from the Food and Drug Administration ("FDA") for various CPAP, BIPAP and ventilator devices.

70.    510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

71.    510(k) clearance generally only requires the manufacturer to notify the FDA under section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

72.    Philips utilized the 510(k) process to receive clearances for each of its Recalled Devices except the E30 ventilator which was marketed under an Emergency Use Authorization (EUA).

73.    With respect to the EUA for the E30 ventilator, on March 24, 2020, in response to "concerns relating to insufficient supply and availability of FDA-cleared ventilators for use in healthcare settings to treat patients during the Coronavirus Disease 2019 (COVID-19) pandemic[,]" the FDA issued an umbrella EUA of ventilators and related equipment. On April 8, 2020, this EUA was extended to the E30 ventilator. A device may be authorized under this umbrella EUA if it "may be effective" in diagnosing, treating, or preventing COVID-19; and according to the FDA, "[t]he 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals."

74.    With respect to the 510(k) process for each of the other Recalled Devices, Philips included data, testing, and biocompatibility results along with its applications to claim substantial equivalence to a predicate device.

75.    Upon reviewing the submissions, the FDA determined Philips' devices were substantially equivalent to a predicate device.

76.    After the devices were sold, Philips had a duty to find, investigate, and report adverse events to the FDA. For example, 21 C.F.R. part 803 requires Philips to conduct a thorough investigation of each event. This duty is triggered when Philips becomes aware of information from any source that reasonably suggests that its device (1) may have caused or contributed to a death or serious injury, or (2) has malfunctioned, and, this device or a similar device it markets, is likely to cause or contribute to a death or serious injury, if the malfunction were to recur. 21 C.F.R. § 803.50.

77.    Additionally, as a manufacturer, Philips has unique knowledge concerning the frequency, severity and predictability of the complications and risks associated with its devices. Accordingly, there is a post-market responsibility under the FDA Regulations related to complaint handling, investigation and reporting to the FDA, including but not limited to:

   a.    21 C.F.R. § 803.10 (for example, § 803.10(c) requires adverse events to be reported by a manufacturer in set time frames from 5 to 30 days when the event becomes known);

   b.    21 C.F.R. § 803.17 ("Medical device manufacturers must develop and implement standardized medical device reporting procedures so that timely evaluation of events and communication of findings can occur.");

c.   21 C.F.R. § 803.18 (§ 803.18(d)(1) requires a device distributor to maintain complaint files and records, including any written, electronic or oral communication, either received or generated by the distributor, that alleges deficiencies related to the identity (e.g., labeling), quality, durability, reliability, safety, effectiveness, or performance of a device.);

d.   21 C.F.R. § 803.20 ("Manufacturers must timely communicate a reportable event. Any information, including professional, scientific, or medical facts, observations, or opinions, may reasonably suggest that a device has caused or may have caused or contributed to an MDR reportable event. An MDR reportable event is a death, a serious injury, or, if you are a manufacturer or importer, a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.");

e.   21 C.F.R. § 803.3 ("If you are a manufacturer, you are considered to have become aware of an event when any of your employees becomes aware of a reportable event that is required to be reported within 30 calendar days or that is required to be reported within 5 work days because we had requested reports in accordance with 803.53(b). You are also considered to have become aware of an event when any of your employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.");

f.   21 C.F.R. § 803.50 ((a) "If you are a manufacturer, you must report to the FDA information required by 803.52 in accordance with the requirements of 803.12(a), no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device that you market:(1) May have caused or contributed to a death or serious injury or (2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." Subsection (b) defines information reasonably known to a manufacturer to include: "[a]ny information that you can obtain by contacting a user facility, importer, or other initial reporter; . . . [a]ny

information in your possession; or . . . [a]ny information that you can obtain by analysis, testing, or other evaluation of the device." Section 803.50 continues: "(2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters. (3) You are also responsible for conducting an investigation of each event and evaluating the cause of the event. If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information. If you later obtain any required information that was not available at the time you filed your initial report, you must submit this information in a supplemental report under 803.56 in accordance with the requirements of 803.12(a).");

g.  21 C.F.R. § 803.52 (detailed individual and device information must be submitted for each adverse event);

h.  21 C.F.R. § 803.53 (information regarding detailed individual and device information must be submitted in a timely manner when remedial action may be required);

i.  21 C.F.R. § 803.56 (supplemental reporting must be done if additional information is learned that became known after the initial report was submitted);

j.  21 C.F.R. § 814.82(a)(2) (manufacturer has a duty of "[c]ontinuing evaluation and periodic reporting on the safety, effectiveness, and reliability of the device for its intended use. FDA will state in the PMA approval order the reason or purpose for such requirement and the number of patients to be evaluated and the reports required to be submitted.");

k.  21 C.F.R. § 814.84 (the periodic reports required by law must contain the reports in the scientific literature that pertain to the device which are known or should be known to the manufacturer); and

l.  21 C.F.R. § 820.198 ("Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a

determination of: (1) Whether the device failed to meet specifications; (2) Whether the device was being used for treatment or diagnosis; and (3) The relationship, if any, of the device to the reported incident or adverse event").

78.    In addition, there are state law duties to monitor, investigate, evaluate and timely report injuries and other important safety information regarding a medical device, which Philips violated when it failed to: monitor, investigate and report PE-PUR foam degradation risk and incidents; take the necessary steps to continually evaluate the safety, effectiveness and reliability of its Recalled Devices; and take necessary steps to warn, strengthen its warnings, and take other measures to assure compliance with its obligations.

III.    PHILIPS' USE OF PE-PUR FOAM POSES SERIOUS HEALTH RISKS TO USERS OF ITS RECALLED DEVICES.

79.    Philips has belatedly revealed that the PE-PUR foam in the Recalled Devices degrades and exposes patients to toxic particles and gases. Such exposure has harmed hundreds of thousands of patients across the United States who used the Recalled Devices.

80.    On the same day as the Recall, Philips released an announcement entitled "Clinical information for physicians." In this announcement, Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)." See Koninklijke Philips N.V. *Sleep and respiratory care update: Clinical information for physicians*, dated Jul. 8, 2021 (annexed herein and marked as Exhibit 6). The PE-PUR foam is black, and when it breaks down, it can release black particles. *Id.* The announcement stated that the foam breakdown "may lead to patient harm and impact clinical care," *Id.* explaining:

> While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment. *Id.*

20

81.   The announcement mentioned two types of hazards from the foam in the devices: dangers from foam degradation and dangers from release of VOCs.

82.   First, the announcement described dangers arising from foam degradation exposure:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.
>
> The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:
>
> - Toluene Diamine
>
> - Toluene Diisocyanate
>
> - Diethylene glycol.

*Id.*

83.   This particulate matter can harm a patient using a Recalled Device in multiple ways including, but not limited to damaging the respiratory system and by transmitting toxic compounds into the respiratory and gastrointestinal systems.

84.   The inhalation of extremely fine particulates, even non-toxic particulates, can lead to adverse health outcomes. The Environmental Protection Agency ("EPA") notes that exposure to particles less than 10 micrometers can be linked to a variety of health problems including: aggravated asthma, decreased lung function, increased respiratory symptoms, and cardiac related diseases." U.S. Environmental Protection Agency. *Health and Environmental Effects of Particulate Matter (PM).* Available online at

https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last accessed Aug. 15, 2023).

85.    On July 8, 2021, Philips released a global supplemental clinical information document that was based on their own testing of the affected devices, stating that, "According to analysis performed by Philips, the majority of particulates are of a size (>8 µm) . . . Smaller particulates (<1-3 µm) are capable of diffusing into deep lung tissue and deposit into the alveoli. During testing performed by an outside laboratory on lab degraded foam, the smallest particulate size identified was 2.69 µm." *See* Exhibit 5.

86.    The purity of the air coming from a breathing device to a patient is highly important and material. Philips advertises the filtration systems in its devices, for example, noting them on a diagram in its DreamStation Family Brochure. Koninklijke Philips N.V. (2016). *DreamStation Sleep therapy system: Rediscovering Dreams.* Available online at https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Aug. 1, 2023). Philips' filtration system, however, does not filter out the particles described above.

87.    In addition to the hazards created by the inhalation of extremely fine particulates, Philips has stated that the particulates created via PE-PUR foam degradation contain toxic compounds such as toluene diamine, toluene diisocyanate, and diethylene glycol. *See* Exhibit 5. As discussed in more detail below, these compounds are toxic and/or carcinogenic when inhaled or ingested.

88.    Philips concluded in its Health Hazard Evaluations ("HHEs") regarding the PE- PUR foam degradation risk that "[b]ased on the cytotoxicity and genotoxicity results and toxicological risk assessment, combined with [the] conclusion that particles are likely to reach the upper airway and potentially the lower respiratory track [sic], a reasonable worst-case estimate for the general and higher risk (e.g., patient populations with preexisting conditions or comorbidities) patient populations is a severity level 3 (Crucial) for both short/intermediate and long term exposure." The FDA's 518(b) notice is annexed herein and marked as Exhibit 6.

89.    Philips' HHEs note that the harm due to foam degradation "'may not be immediately recognizable and may not be something that the customer would/could report,' adding that certain harms 'may not be easily linked to the hazardous situation or device use in general'— and that in the case of genetic mutations in particular, 'a presumed

22

lag time from exposure to harm development may make it difficult for patients to attribute their individual harm to the device. *Id.* at 5.

90. The second hazard is the release of VOCs, that is, toxic and carcinogenic chemical emissions from the PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl).

*See* Exhibit 5.

91. In addition to these two compounds, Philips has also found high levels of formaldehyde, a known carcinogen, in analyses of the Recalled Devices. Collectively, these compounds released by PE-PUR foam—formaldehyde, toluene diamine, toluene diisocyanate, diethylene glycol, dimethyl diazine, and phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)—are referred to herein as the "Foam Toxins."

92. Philips admitted that the risks of these VOCs include: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver." *Id.*

93. It is beyond reasonable dispute that patients using the Recalled Devices were exposed to harmful particulates and the toxic Foam Toxins. As detailed below, each of the Foam Toxins poses a serious health hazard to users of the Recalled Devices.

A.      Formaldehyde is a Known Carcinogen.

94.     Although Philips has not publicly acknowledged that formaldehyde is used in the manufacturing process for PE-PUR foam or is a byproduct of PE-PUR foam degradation, Philips' internal testing (dated May 22, 2019) reported the presence of formaldehyde in analyses of DreamStation 1 devices, finding "tolerable limits of the Formaldehyde compound were exceeded during initial operation, as well as at the [redacted]." *See* Exhibit 2, at 6.

95.     Formaldehyde has been classified as carcinogenic to humans (Group 1) by the International Agency for Research on Cancer ("IARC") since 2006. International Agency for the Research of Cancer, *Formaldehyde*. IARC Monograph 100F, dated December 21, 2021 (annexed herein and marked as Exhibit 7). The IARC, an agency of the World Health Organization, groups carcinogenic and potentially carcinogenic substances into five categories: Group 1, carcinogenic to humans; Group 2A, probably carcinogenic to humans; Group 2B, possibly carcinogenic to humans; Group 3, not classifiable as to its carcinogeneity to humans; and Group 4, probably not carcinogenic to humans. International Agency for Research on Cancer (last updated Jul. 1, 2022). *Agents Classified by the IARC Monographs, Volumes 1–129.* Available online at http://monographs.iarc.fr/ENG/Classification/index.php        (last accessed Aug. 24, 2023). The EPA uses an equivalent grouping system of five categories (Groups A-E). See U.S. Environmental Protection Agency (last updated Nov. 21, 2022). *Risk Assessment for      Carcinogenic      Effects.*      Available      online      at https://www.epa.gov/fera/risk-assessment-carcnogenic-effects (last accessed Aug. 28, 2023).Governmental authorities in the United States have reached similar conclusions: the National Toxicology Program in the United State Department of Health and Human Services ("NTP") has classified formaldehyde as a known human carcinogen since 201136; and the EPA has considered formaldehyde to be a probable human carcinogen (Group B1) since 1989. *See* U.S. Department of Health and Human Services National Toxicology Program., *Formaldehyde,* 15th Report on Carcinogens, dated December 21, 2021 (annexed herein and marked as Exhibit 8).

96.     There is extensive research, including dozens of human epidemiological studies, showing an association between formaldehyde exposure and numerous forms of cancer, including: nasopharyngeal cancer; sinonasal cancer; leukemia; lung cancer; lymphohematopoietic cancers (other than leukemia); nasal, oral, and throat cancers (other than nasopharyngeal and sinonasal cancers);

brain cancer; hepatic cancer; esophageal cancer; thyroid cancer; and pancreatic cancer. *See* National Cancer Institute (Jun. 10, 2011). *Formaldehyde and Cancer Risk.* Available online at https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet#r1 (last accessed Aug. 28, 2023). Additionally, exposure to formaldehyde appears to have a strong causal relationship to asthma. *See* Exhibit 8.

B.    Toluene Diisocyanate is a Likely Carcinogen.

97.    Toluene diisocyanates ("TDIs") are used primarily to manufacture flexible polyurethane foams such as PE-PUR foam. Philips has recognized that PE-PUR foam releases TDIs as it degrades. *See* Koninklijke Philips, *Sleep and Respiratory Care update: Clinical Information for Physicians,* dated July 8, 2021 (annexed hereto and marked as Exhibit 9) ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include ... toluene diisocyanate isomers (TDI)").

98.    TDI is classified as possibly carcinogenic to humans (Group 2B) by IARC. *See* International Agency on Cancer Research, *Toluene diisocyanates*, IARC Monograph 71, dated December 21, 2022 (annexed hereto and marked as Exhibit 10). The U.S. Centers for Disease Control ("CDC"), Occupational Safety and Health Administration ("OSHA"), and National Institute for Occupational Safety and Health ("NIOSH") also regard TDI as a potential human carcinogen based on tumorigenic responses in TDI treated rats and mice. *See, e.g.,* U.S. Department of Health and Human Services, National Toxicology Program (Dec. 21, 2021). *Toluene diisocyanates.* 15th Report on Carcinogens (annexed hereto and marked as Exhibit 11). The EPA has taken action under the Toxic Substances Control Act to allow oversight of the use of TDI in consumer products. U.S. Environmental Protection Agency. *Fact Sheet: Toluene Diisocyanate (TDI) and Related Compounds* (last updated Mar. 7, 2023) (annexed hereto and marked as Exhibit 13). NTP classifies TDI as "reasonably anticipated to be a human carcinogen" based on sufficient evidence of carcinogenicity from studies in experimental animals. The European Union warns that TDI "is fatal if inhaled." European Chemicals Agency. *Substance Infocard: m-tolylidene diisocyanate* (n.d.). Available online at https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed Aug. 28, 2023).

99.    Administration of TDI by stomach tube caused liver tumors (hepatocellular adenoma) in female rats and mice, benign tumors of

the mammary gland (fibroadenoma) and pancreas (islet-cell adenoma) in female rats, and benign tumors of the pancreas (acinar-cell adenoma) in male rats. It also increased the combined incidences of benign and malignant tumors of subcutaneous tissue (fibroma and fibrosarcoma) in rats of both sexes and of the blood vessels (hemangioma and hemangiosarcoma) in female mice. *See* Exhibit 11. Exposure to TDI also has been documented to cause respiratory irritation, asthma, and lung damage. *See* Exhibit 13.

C.     Toluene Diamine is a Likely Carcinogen.

100.     Philips has recognized that PE-PUR foam releases toluene diamine ("TDA") as it degrades. European Chemicals Agency. *Substance Infocard: m-tolylidene diisocyanate.* Available online at https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed Aug. 29, 2023). Additionally, TDA is a hydrolysis product of TDI.

101.     IARC has classified TDA as possibly carcinogenic to humans (Group 2B), and the EPA classifies it as a probable human carcinogen. *See* Exhibit 15; U.S. Environmental Protection Agency (last updated Jan. 2000). Toluene-2, 4-Diamine. Available online at https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last updated Aug. 28, 2023). The European Union has concluded that TDA "cannot be considered safe for use" even as a hair dye, let alone breathed into the lungs for many hours each night. European Commission, Health and Sciences Committees (Sep. 18, 2012). *OPINION ON Toluene-2,5-diamine and its sulfate.* Available online at https://ec.europa.eu/health/scientific_committees/consumer_safety/docs/sccs_o_093.pdf (last accessed Aug. 28, 2023). The NTP classifies TDA as reasonably anticipated to be a human carcinogen based on animal studies.

102.     Available data on TDA primarily comes from animal studies. These studies strongly support an association between TDA and hepatic cancer. *Id.* There is evidence of a link between TDA exposure and pulmonary fibrosis based on in vitro studies in which human lung fibroblasts were exposed to TDI and TDA. The EPA has determined that acute exposure to TDA can produce severe skin and eye irritation, sometimes leading to permanent blindness, respiratory problems (e.g., asthma), rise in blood pressure, dizziness, convulsions, fainting, and coma.[1] It is well established that TDI is

---

[1] *Id.*

converted to TDA through hydrolysis (a reaction caused by exposure to water). *See* U.S. Centers for Disease Control, National Institute for Occupational Safety and Health. *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.* Current Intelligence Bulletin 53, NIOSH Pub. No. 90-101 (December 1989). Available online at https://www.cdc.gov/niosh/docs/90-101/default.html (accessed Aug. 28, 2023). Thus, ingested TDI may react with saliva and/or gastrointestinal fluids and convert to TDA. Additionally, there is evidence that inhaled TDI is converted into TDA by reaction with a substance (gluthathione) present in the lungs. As a result, observed effects ascribed to TDI may be due to unmeasured conversion to TDA after exposure.Exposure to TDA can also cause irritation of the skin, nose, and throat, damage to reproductive and neurological systems, eye irritation, dermatitis, ataxia, tachycardia, respiratory depression, stomach gas, hypertension, nausea, vomiting, methemoglobinemia, cyanosis, headache, weakness, exhaustion, dizziness, convulsions, fainting, and coma. U.S. Environmental Protection Agency. *Toluene-2, 4-Diamine.* Available online at https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last updated Aug. 28, 2023).

D.    Diethylene Glycol is Toxic to Humans.

103.   Diethylene glycol ("DEG") is a widely used solvent. It is a colorless and odorless liquid with a sweetish taste and has often been a contaminant in consumer products, resulting in numerous epidemics of poisoning. DEG is used in the production of polyester polyurethane foam, and Philips has advised that DEG is a byproduct of PE-PUR foam degradation. *See* Exhibit 9 ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include diethylene glycol (DEG) … .").

104.   DEG has an historical involvement in mass poisonings around the world. Famously, DEG caused the death of 100 people across 15 states in the 1937 Elixir Sulfanilamide Incident, which served as a catalyst for the enactment of the Federal Food, Drug, and Cosmetic Act ("FDCA") in 1938. *See* U.S. Food and Drug Administration. *Sulfanilamide Disaster.* FDA Consumer Magazine (July 1981) (annexed hereto and marked as Exhibit 17.

105.   DEG is a toxic substance with a mean fatal dose of 1 mL/kg of pure DEG. L.J. Schep, et al. *Diethylene glycol poisoning.* Clinical Toxicology 47(6):525-35 (July 2009). Ingesting only a small amount may result in gastrointestinal distress and stupor. U.S. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (last updated Oct. 20, 2021). *Ethylene Glycol:*

*Systemic          Agent.*     Available          online          at
https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750
031.html#:%7E:text=Agent%20Characteristics&text=DESCRIPTIO
N%3A%20Ethylene%20glycol%20is%20a,also%20be%20a%20ph
armaceutical%20vehicle (last accessed Aug. 28, 2023). Exposure
may cause irritation of the eyes, skin, and mucous membranes. Id.
DEG has also been shown to have damaging toxic, irritating, and
inflammatory properties when inhaled. *See, e.g.,* C.J. Hardy, et al..
*Twenty-eight-day repeated-dose inhalation exposure of rats to
diethylene glycol monoethyl ether.* Fundamental Applied Toxicology
38(2):143-47 (August 1997).

E.     Dimethyl Diazine is a Precursor to a Known Carcinogen.

106.   Dimethyl diazene ("DD"), also known as azomethane, is "associated
       with the production process of the [PE-PUR] foam." See Exhibit 11
       (finding that during "testing which ran a device at 35°C ± 2°C for 168
       hours, two compounds of concern were emitted from the device:
       dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-
       methylpropyl)"). Philips has admitted that DD is emitted from PE-
       PUR foam under normal conditions and possibly also as the result of
       degradation. *Id.*

107.   IARC has not yet evaluated the potential carcinogenicity of DD to
       humans, as there is scant data concerning the effects of DD on
       humans and animals. However, DD is a member of a family of
       carcinogenic substances: 1,2-dimethylhydrazine (a Group 2A
       probable human carcinogen that exhibits hepatotoxic effects along
       with injuries to other organs in animal experiments) dehydrogenates
       into DD, which then oxidizes into azoxymethane (a known
       carcinogen that has not yet been classified by the EPA or IARC). G.
       Choudary (1997). *Toxicological Profile for Hydrazines.* Agency for
       Toxic Substances and Disease Registry; R.B. Wilson (1976).
       *Species variation in response to dimethylhydrazine.* Toxicology and
       Applied Pharmacology, 38:3; M.A. Bedell, et al. (1982). *Cell
       Specificity in Hepatocarcinogenesis: Preferential Accumulation of O6
       Methylguanine in Target Cell DNA during Continuous Exposure of
       Rats to 1,2-Dimethylhydrazine.* Cancer Res 42:3079-3083; W.J.
       Visek, et al. (1991). *Dietary protein and chronic toxicity of 1,2-
       dimethylhydrazine fed to mice.* Journal of Toxicology and
       Environmental Health, 32:4, 383-413. Azoxymethane further
       oxidizes into methylazoxymethanol, a Group 2B possible human
       carcinogen. E. Fiala (Dec. 1975) *Investigations into the metabolism
       and mode of action of the colon carcinogen 1, 2-dimethylhydrazine.*
       Cancer, 36:2407-12; S. Wolter, N. Frank (1982). *Metabolism of 1,2-
       dimethylhydrazine in isolated perfused rat liver.* Chemico-Biological

Interactions, 42:3, 335-344; International Agency on Cancer Research (1987). *IARC Monograph – 71-42*; International Agency on Cancer Research (1987). *IARC Monograph Supplement 7*; H. Druckrey (1970). *Production of colonic carcinomas by 1,2-dialkylhydrazines and azoxyalkanes. Carcinoma of the Colon and Antecedent Epithelium 267-279.* Both methylazoxymethanol and 1,2-dimethylhydrazine have been found to metabolize into formaldehyde, a Group 1 known carcinogen. P. Harbach, et al. (1981) *Effects of selenium on 1,2-dimethylshydrazine metabolism and DNA alkylation*; S.N. Newaz, et al. (1983). *Metabolism of the Carcinogen 1,2Dimethylhydrazine by Isolated Human Colon Microsomes and Human Colon Tumor Cells in Culture*; J. Erikson, et al. (1986). *Oxidative Metabolism of Some Hydrazine Derivatives by Rat Liver and Lung Tissue Fractions.* Thus, an individual regularly exposed to DD may also have been exposed to 1,2-dimethylhydrazine, azoxymethane, methylazoxymethanol, and/or formaldehyde—each of which is recognized as a known or probable carcinogen—as these compounds are oxidized and metabolized.

108.    DD is clearly linked to colorectal cancer in mice. Azoxymethane, the product of oxidized DD, is used to induce colorectal cancer in animals and has been shown to cause hepatic lesions, intestinal tumors, and renal tumors. M. Kobaek-Larsen, et al. (Jun. 2004) *Secondary effects induced by the colon carcinogen azoxymethane in BDIX rats.* APMIS 112(6):319-29.Oxidized azoxymethane produces methylazoxymethanol, which is known to cause DNA damage and has been associated with amyotropic lateral sclerosis, parkinsonism, dementia, colon cancer, liver cancer, and prostate cancer. P. Spencer, et al. (2012). *Unraveling 50-Year-Old Clues Linking Neurodegeneration and Cancer to Cycad Toxins: Are microRNAs Common Mediators?.* Frontiers in Genetics 3. Exposure to DD—as the precursor to these carcinogenic compounds—means exposure to these other compounds and the health risks they pose.

F.    Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl) is a Toxic Compound.

109.    The substance Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl) ("DTBSBP") is "associated with the production process of the foam." *See* Exhibit 11 (finding that during "testing which ran a device at 35°C ± 2°C for 168 hours, two compounds of concern were emitted from the device: dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)"). According to Philips, DTBSBP is emitted from PE-PUR foam under normal conditions and possibly also as the result of degradation. *Id.*

110.   In 2010, the Canadian government determined that DTBSBP was a Schedule 1 toxic substance under the Canadian Environmental Protection Act "based on available information regarding possible persistence, accumulation in organisms and potential to cause harm to organisms." Government of Canada. Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl)- (DTBSBP). Available online at https://www.canada.ca/en/health-canada/services/chemical-substances/challenge/batch-8/1-methylpropyl.html (last accessed Aug. 28, 2023). These findings prompted Canadian regulators to propose "virtual elimination" of DTBSBP. *Id.*

IV.   **PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM FOR MANY YEARS PRIOR TO THE RECALL.**

111.   At the time it installed PE-PUR foam into the Recalled Devices, Philips was required to test the devices in accordance with ISO 18562-2:2017 and ISO 18562-3:2017.

112.   At that time, Philips should have known the PE-PUR foam posed a safety risk to users.

113.   The FDA concluded after an investigation of Philips' Recalled Devices that beginning in at least 2008, and over time, Philips received hundreds of thousands of customer complaints regarding foam degradation in the Recalled Devices and, years later, received data from a variety of sources confirming foam degradation.

114.   The FDA's findings were based, in part, on twenty-one (21) site inspections of Philips' Murrysville, Pennsylvania facility between August 26, 2021 and November 9, 2021. The lead FDA investigator, Katelyn A. Staub-Zamperini, memorialized the agency's findings in a 28-page FDA-483 Report issued on November 9, 2021. *See* Exhibit 2. The FDA delivered the 483 Report to Rodney Mell, Head of Quality and Regulatory at Philips Respironics, on or around November 9, 2021. *Id.* at 1, 28.

115.   A 483 Report "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts." U.S. Food and Drug Administration. *FDA Form 483 Frequently Asked Questions.* Available online at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed Aug. 28, 2023). These observations are made in a 483 Report "when in the investigator's judgment, conditions or practices observed would

30

indicate that any food, drug, device or cosmetic has been . . . or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health." *Id.*

116.  In connection with its investigation for its 483 Report, the FDA learned that Philips received hundreds of thousands of complaints from customers about degradation of the foam in its Recalled Devices beginning at least as early as 2008:

> [A] query of your firm's consumer complaints from 01/01/2008 to current, for the keywords contaminants, particles, foam, debris, airway, particulate, airpath, and black, **resulted in over 222,000 complaints, and over 20,000 of which occurred between 2008 to 2017 and involved Trilogy devices.** Additionally, your firm performed a foam related complaint data analysis in April 2021 on complaints confirmed to be related to or involve foam degradation issues. The raw complaint data documents that **30 Trilogy related complaints were received from 2014 to 2017, and 1,254 related complaints were received across all products containing the affected foam, from 2014 to 2021.** *See* Exhibit 2, at 12 (emphasis added).

117.  Yet, "[n]o formal investigation, risk analysis, or CAPA were initiated, performed, or documented [by or on behalf of Philips], in response to the at least 222,000 complaints that could potentially be related to foam degradation and received from 2008 to 2017 . . . ." *Id.* at 16.

118.  A Corrective and Preventative Action ("CAPA") refers to procedures that medical device manufactures must follow to identify and attempt to correct a quality problem after one is detected. *See* 21 C.F.R. § 820.100. A CAPA is designed "to collect information, analyze information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence." U.S. Food and Drug Administration (last updated Mar. 28, 2023). *Corrective and Preventive Actions (CAPA).* Available online at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-guides/corrective-and-preventive-actions-capa (last accessed Aug. 28, 2023).

119.  The FDA also found that Philips "was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015 . . . ." See Exhibit 2 at 18.

120.    In fact, an adverse event report from the FDA Manufacturer and User
        Facility Device Experience ("MAUDE") database shows that, as early
        as 2011, Philips knew that a patient discovered "black dust" on her
        nose when she awoke after using a Philips RemStar CPAP device
        and subsequently underwent treatment for "intoxication" and "chest
        tightness." U.S. Food and Drug Administration. *MAUDE Adverse
        Event Report: RESPIRONICS, INC. REMSTAR PRO
        INTERNATIONAL.* Retrieved online from
        http://www.fdable.com/advanced_maude_query/324fd08a137ce36c
        2d5faf453ee26f2f (last accessed Aug. 28, 2022).

121.    Philips investigated this report and confirmed that the device
        contained "evidence of an unk[nown] black substance in the air path
        and on internal components . . . present throughout both the intake
        and exhaust portions of the air path . . . ." *Id.*

122.    The FDA found that Philips' analysis of consumer complaints was
        itself defective in that it "was not adequately performed to identify or
        detect quality problems." *See* Exhibit 2 at 16. The FDA concluded
        that "potential foam degradation in Trilogy ventilator devices is not
        an isolated incident, and you [Philips] also have not documented a
        detailed rationale for why harm is not likely to occur again, as
        required by your Health Hazard Evaluation's instructions." *Id.* at 13.
        In light of this, the FDA concluded that Philips' "risk analysis is
        inadequate or was not performed when appropriate or within an
        appropriate time frame of your firm becoming aware" of these issues.
        Id. at 3.

123.    The FDA has concluded that:

                Beginning in 2015, Philips received data from a variety
                of sources regarding degradation of the PE-PUR foam
                contained within the recalled devices, including
                complaints, test reports, information from suppliers,
                and information from another entity owned by Philips'
                parent company. Philips failed to adequately evaluate
                this data and incorporate it into its CAPA [Corrective
                and Preventive Actions] system for further investigation
                and potential mitigation, as required by current good
                manufacturing practice requirements codified in 21
                C.F.R. § 820.100. *See* Exhibit 6 at 6.

124.    The FDA 483 Report also noted, that "an incorrect and non-specified
        polyester polyurethane, raw foam product, sourced from your
        [Philips'] raw foam supplier resulted in non-conforming Trilogy Evo
        ventilatory finished devices being approved, released, and

distributed which further resulted in the ongoing correction and removal." *See* Exhibit 2 at 25. The correction and removal "were established as part of [Philips'] response to failed VOC and ISO 18562 testing of related Trilogy EVO ventilatory medical devices, which resulted from the presence of the non-specified polyester polyurethane foam component, incorrectly supplied by [Philips'] raw foam supplier." *Id.*

125.   On May 2, 2022, the FDA issued a formal notice to Philips pursuant to Section 518(b) of the FDCA, 21 U.S.C. § 360h(b) (the "518(b) Notice"). *See* Exhibit 6. The 518(b) Notice stated that the FDA's "Center for Devices and Radiological Health (CDRH) is proposing that an order should be issued pursuant to section 518(b)" of the FDCA "to require Philips to submit a plan for the repair, replacement, and/or refund of the purchase price of devices subject to the recall that were manufactured after November 2015, sufficient to assure that the unreasonable risk of substantial harm to the public health presented by those devices will be eliminated." *See* Exhibit 6 at 1. This notice was directed to Thomas J. Fallon, Head of Quality, Sleep and Respiratory Care, for Philips Respironics, Inc.

126.   The 518(b) Notice stated that "there is sufficient evidence for FDA to determine that the devices subject to the recall present an unreasonable risk of substantial harm to the public health" and "that there are reasonable grounds to believe that the recalled devices that Philips manufactured after November 2015 were not properly manufactured with reference to the state of the art as it existed at the time of the devices' manufacture." *Id.* at 2.

127.   The FDA concluded that "patients and providers cannot readily mitigate the unreasonable risk associated with the recalled devices[.]" *Id.*

128.   The FDA also concluded that "[t]his risk is not the unavoidable byproduct of current ventilator, CPAP machine, and BiPAP machine technologies. Indeed, Philips and its competitors market ventilators, CPAP machines, and BiPAP machines that do not use PE-PUR foam." *Id.*

A.    In 2015, Philips Communicated with its Foam Suppliers About the problem of PE-PUR Foam Degradation.

129.   The PE-PUR foam that Philips used in its Recalled Devices was manufactured by William T. Burnett & Co. ("Burnett"), a bulk foam manufacturer. Burnett produces foam in sheets that are between

approximately four feet to more than six feet wide and may be as long as one hundred or two hundred feet.

130.   Burnett sells its bulk foam to intermediaries, including PolyTech and The SoundCoat Company ("SoundCoat"). PolyTech and SoundCoat then sell the foam to Philips, either directly or through another intermediary, such as Paramount Die Corporation, which may modify the foam.

131.   According to the FDA, "email correspondence between [Philips] and its raw foam supplier [PolyTech] beginning 10/30/2015 and forward, document that [Philips] was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015, which was later confirmed by [Philips'] foam supplier on 08/05/2016, via email." *See* Exhibit 2 at 18.

132.   On August 5, 2016, Bob Marsh, a PolyTech employee, wrote to Lee Lawler, an employee of Burnett, referencing a concern expressed by one of its customers [Philips] in the Fall of 2015 regarding foam degradation in its medical devices. See April 1, 2022 Affidavit of Lee F. Lawler and selected exhibits (filed in the case of *In re: Philips CPAP, Bi-PAP, and Ventilator Products Liability Litigation,* MDL-3014 (W.D. Pa.), ECF No. 589); August 5, 2016 e-mail exchange between Lawler and Bob Marsh, who is employed by Defendant Polymer Technologies, Inc., filed in the multidistrict litigation, ECF No. 589-7) at WTB 00056). Mr. Marsh stated: "They [Philips] are asking again, and wondered if we could give them any estimate on lifespan of the foam when exposed to 40°C and high humidity." Mr. Lawler responded that, under those conditions, he "would not be surprised if ester foam . . . would exhibit signs of hydrolysis in as short a time as a year." *Id.* He added that "that is not a good environment for polyester foam. Polyether foam could last years in that environment." *Id.* Presumably referring to Philips, Mr. Marsh responded that he would "let them know they'd be better off with the ether." *Id.*

133.   Knowing about these issues with the PE-PUR foam, Philips tested the foam material used in its Recalled Devices. According to the FDA, "this testing spoke only to the limited finding that in the case of the [redacted] foam samples 'returned from service in a Pacific rim location,' spectroscopy results were 'consistent with an environmental/chemical exposure causing base polymer cleavage and embrittlement of the material.'" *See* Exhibit 6, at 7. Nonetheless, based on the results of this limited testing, Philips concluded that no escalation to a CAPA process was required. *Id.*

34

134.   According to the FDA, "no further investigation, health hazard evaluation, risk analysis, or design review was performed or documented by Philips at that time . . . and no preventative maintenance procedures were implemented[,]" other than a limited "preventative maintenance procedure" instituted by a Philips "entity owned by the parent company of Philips Respironics . . . to replace the air intake assembly of Trilogy ventilator products, due to complaints that had been received regarding degradation of the PE-PUR foam contained in the products." *Id.* at 6-7. And even then, "Philips did not verify the effectiveness of this measure." *Id.* at 8.

135.   As Philips continued to ask its supplier about the properties of the PE-PUR foam and encountered more warning signs, it continued to put that foam in medical devices that millions of its customers were breathing through daily.

136.   Testing conducted for Philips in 2016 confirmed that Mr. Lawler from Burnett was correct. According to the FDA, this testing "determined that the PE-PUR foam was susceptible to degradation, resulting in the conclusion at that time that 'polyester urethanes show bad resistance against high humidity in combination with high temperature.'" *Id.* at 7-8. Additional testing "determined that, compared to PE-PUR foam, another type of foam, polyether urethane, 'show[s] a far better resistance against high humidity at high temperature.'" *Id.* at 8.

137.   The 483 Report identified "at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices." *See* Exhibit 2 at 3. It listed the specific analyses and tests, including one which concluded that "contrary to polyester urethane foams, [redacted] foams shows a far better resistance against high humidity at high temperature." *Id.* at 4.

138.   Philips received at least 110 complaints confirmed to be related to foam degradation between 2014 and 2017. *See* Exhibit 6 at 7. Approximately 80 of these complaints concerned CPAP and BiPAP devices. *Id.* at 8.

139.   Nonetheless, Philips continued manufacturing and selling the now Recalled Devices containing PE-PUR foam and failed to warn prescribing physicians, durable medical equipment companies and the patient consumers of this problem.

B.     Philips Opened an Internal Investigation into Foam Degradation in Mid-2018 that Confirmed PE-PUR Foam is Prone to Degradation.

140.   In April 2018, Philips opened a precursor to a formal CAPA, referred to by Philips as a CAPA INV 0988, "to investigate complaints related to potential foam degradation for the Trilogy devices in Australia and to determine what actions should be taken." *Id.* Philips reported that "[u]nits were returned from the field where the Trilogy Removable Air Path Foam [redacted] and the foam in the Inlet Air Path Assembly [redacted] was degrading, and getting into the motor/air path, causing at least 1 Trilogy unit to fail." *See* Exhibit 2 at 14.

141.   On April 20, 2018, Vincent Testa, a Project Mechanical Engineer at Philips, emailed Bonnie Peterson, a Project Manager at PolyTech. Mr. Testa stated, "We use the PAFS foam in the air path of our Trilogy family of ventilators as a means for noise reduction . . . ." *See* Exhibit 18 at WTB 000070.

142.   PAFS foam is PolyTech's open cell, flexible acoustical grade PE-PUR foam. Mr. Testa at Philips continued: "Recently weve [sic] received a few complaints from our customers that the foam is disintegrating . . . . The material sheds and is pulled into the ventilator air path. As you can imagine, this is not a good situation for our users." Mr. Testa asked, "what could cause this material to break down." *Id.*

143.   On April 23, 2018, Mr. Marsh from PolyTech forwarded Philips' April 20, 2018 email to Mr. Lawler from Burnett, reporting that "[t]he customer [Philips] is finding degradation of the ester foam and the urethane film in their device, such that particles are breaking off and flowing in the airstream." *See* Exhibit 18 at WTB 000069-000070.

144.   On May 2, 2018, Mr. Marsh added in an email to Mr. Lawler that "Philips gave us another bit of information. They tested ether vs ester in high heat and humidity and found ether to be the better performer. It validated what we (you) had conveyed." *See* Exhibit 18 at WTB 000069. Mr. Marsh asked whether exposure to oxygen, higher temperature, and higher humidity could accelerate deterioration of PE-PUR foam. *Id.*

145.   Mr. Lawler responded that he did "not believe that exposure to oxygen will cause any significant damage to polyurethane foam unless elevated temperature and/or humidity is also present." *See* Exhibit 18 at WTB 000069.

146.   On May 3, 2018, Mr. Testa from Philips admitted in a follow-up email to Mr. Marsh from PolyTech, that:

> We [Philips] are evaluating our options regarding the foam. We could switch to the PAF [ether-based foam], or we could indicate a preventative maintenance cycle in which they would replace the PAFS [ester-based] foam pieces. . . . The environmental conditions for our device are a maximum of 40C and 95% R.H. Note the difference in temperature.

*See* Exhibit 18 at WTB 000068-69.

147.    Mr. Testa at Philips asked Mr. Marsh from PolyTech the following:

1.    Please ask your foam supplier to calculate the service life based on this higher temperature (40C vs. 27C).

a.    It would also be useful if they could provide a graph depicting failure over time. For example, if tensile strength reduced over time, they would plot strength vs. time.

2.    At the end of the service life, what is the failure mode of this material?

*Id.*

148.    Mr. Marsh again forwarded these questions to Mr. Lawler at Burnett, who responded:

> I am unable to answer Question Number 1. We would not recommend using **polyester** foam in such an environment and have no direct data to use to calculate the rate of hydrolysis. **Polyether** foam lifetime would not be expected to reduce significantly at the stated conditions. Use with pure oxygen could shorten the lifetime some by promoting more rapid oxidation. I do not know the extent of the reduction, but do not expect it to be overly significant.

> Polyester foam will lose tensile strength and overall integrity as it hydrolyzes. It will eventually decompose to a sticky powder. That will happen very rapidly at 40C, 95% R.H.

*See* Exhibit 18 at WTB 000067-68 (emphasis in original).

37

Mr. Lawler from Burnett added: "Is it one of our data sheets that states foam lifetime being 10 years at 95% R.H? I do not think I have seen a sheet with that statement." *Id.* at WTB 00068. Mr. Marsh at PolyTech responded that he would pass along the information to Philips and that "[w]e have no idea where that statement came from. It has been on our data sheets for probably 20 years. We are removing it." *See* Exhibit 18 at WTB 000067.

149.  Notably, PolyTech still advertises on its website that PE-PUR foam is resistant to heat and humidity. *See* Polymer Technologies, Inc. (n.d.). *Acoustic Foam for Sound Absorption.* Available online at https://www.polytechinc.com/products/polymer-acoustic-foam (last accessed Aug. 29, 2022) ("Ester foams have superior physical properties and offer excellent resistance to heat, moisture, and chemicals.").

150.  On May 23, 2018, Mr. Marsh from PolyTech forwarded to Mr. Lawler from Burnett another question from Mr. Testa at Philips about the degradation of the foam it was using in its Recalled Devices. *See* Exhibit 18 at WTB 000066-67. Mr. Testa explained that Philips had "sent samples to a local lab for analysis." *Id.* at WTB 00066. The local lab concluded that the degradation was a result of cleavage of the bonds in the base polymer, and Mr. Testa stated that "[f]urther investigation concluded that prolonged exposure to high humidity causes the foam to degrade." *Id.* at WTB 00067. Mr. Testa noted that "[a]s the foam degrades it breaks down into small particulate" and asked whether the foam "maintain[s] its UL 94 Flame Resistance rating if it is broken down into particulate?" *Id.*

151.  Mr. Lawler replied: "I am sure the degraded foam will not perform well in UL94 testing, though I cannot imagine how one would actually perform the test on such degraded material." *See* Exhibit 18 at WTB 000066.

152.  On June 7, 2018, Mr. Testa at Philips again emailed Mr. Marsh at PolyTech:

As we continue our investigation of the deterioration of the PAFS foam, a few questions has [sic] been posed regarding the material. Can you please reach out to your foam supplier regarding the following.

1.  What is the actual composition of the polyurethane-ester foam PAFS-038? (CAS         #s/percentages/weight

percent/reactive groups etc. any chemistry is very appreciated)

2.    What kind of diisocynate is used in the polyurethane foam synthesis process and how much?

3.    Is diethylene glycol or another polyol utilized in the foam synthesis process?

4.    Have you tested to see if all diisocyanate groups are reacted in your foam or are there unreacted groups even after manufacturing?

*See* Exhibit 18 at WTB 000076-77.

153.    Mr. Marsh (PolyTech) forwarded the questions to Mr. Lawler (Burnett), who asked why Mr. Testa (Philips) needed this information. Mr. Marsh did not provide a definitive answer but said, "What Vince [Testa] told us is that they are investigating alternatives to polyurethane foam (ester and ether)." *See* Exhibit 18 at WTB 000075.

154.    Mr. Lawler ultimately did not answer Mr. Testa's questions because they touched on Burnett's confidential, proprietary information.

155.    On June 20, 2018, Philips closed CAPA INV 0988. *See* Exhibit 2 at 15. According to the FDA, Philips implemented "a preventative maintenance procedure for Trilogy devices, but Philips did not verify the effectiveness of this measure." *See* Exhibit 6 at 8. Yet "after CAPA INV 0988, Philips modified its CAPA procedures to include 'requirements to help ensure that CAPAs are fully complete [and] appropriately scoped,' and that 'processing the issue [that was the subject of CAPA INV 0988] through the current CAPA program would have result[ed] in an appropriate horizontal assessment.'" *Id.*

156.    The FDA pointed out that Philips' informal CAPA INV related to these Trilogy devices did "not include, investigate, or examine all of [Philip's] CPAP and BiPAP medical devices, which also include similar air path assemblies and/or the affected polyester polyurethane [PE-PUR] foam, which is susceptible to degradation." The 483 Report explained that Philips's practice at the time was to first open CAPA requests—called "CAPA INVs"—as a precursor to a formal CAPA, but this could only occur if approved by a "CAPA Review Board" or delegate. *See* 483 Report at 14-15. But Philips had acknowledged to the FDA that it had "received approximately eighty

complaints related to foam degradation, **on non-Trilogy ventilator devices,** from 2014 to 2017." *Id.* at 16 (emphasis added).

157.   The FDA concluded that Philips had not "adequately established" procedures for initiating CAPA procedures. *Id.* at 14. Specifically, the FDA faulted Philips for not initiating a "formal" CAPA after receiving "various complaints alleging foam degradation in Trilogy ventilator devices" and then closing its informal investigation just two months later without "verify[ing] the effectiveness" of the limited "preventative maintenance procedure for Trilogy devices." *See* Exhibit 6 at 8.

158.   Philips continued to receive more information suggesting that the PE-PUR foam was prone to degradation. According to the FDA, "[a] follow-up email amongst [Philips'] personnel, dated 08/24/2018, states that testing confirmed that the affected foam breaks down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints . . . ." *See* Exhibit 2 at 18.

159.   Further, "[o]n December 12, 2018, several months after CAPA INV 0988 was closed, a report from additional testing conducted for Philips found that '[p]olyester polyurethane foam showed clear disintegration after 2 weeks." *See* Exhibit 6 at 8.

160.   Nonetheless, Philips continued manufacturing and selling the Recalled Devices containing PE-PUR foam.

161.   Philips failed to apprise the FDA of the facts and problems it learned from its foam suppliers about premature foam degradation risks.

162.   Philips failed to apprise the FDA of consumer, medical provider and durable medical equipment company reports of the presence of foam particles and other device failures.

C.   **Philips Finally Opened a Formal CAPA in 2019 – But Did Not Initiate a Recall for Two More Years.**

163.   In April 2019, Philips received two complaints that "sound abatement foam 'is degrading and entering the air path[.]'" *Id.*

164.   In response, in June 2019, Philips finally initiated a formal CAPA, numbered CAPA 7211, related to the issues associated with the PE-PUR foam. But as the FDA explains:

>   Even then, that CAPA failed to evaluate all relevant data. Philips' search of FDA's Manufacturer and User Facility Device Experience (MAUDE) database in connection with CAPA 7211 identified only three

medical device reports (MDRs) associated with potential foam degradation involving Trilogy ventilators between January 2011 and January 2021. Yet an MDR analysis conducted by Philips in 2018 had already identified 17 documented complaints related to foam degradation in Trilogy ventilators, and at least 14 of those 17 complaints had related MDRs. Similarly, Philips' analysis of foam degradation-related complaints conducted in connection with CAPA 7211 identified 1,254 complaints confirmed to be related to foam degradation between 2014 and April 2021 across all affected products, yet this analysis failed to include several complaints confirmed to be related to foam degradation in Trilogy ventilators that were documented in 2018 in connection with CAPA INV 0988.

*Id.* at 8-9.

165.  Philips continued to test the PE-PUR foam while the CAPA was underway. A Biological Risk Assessment dated July 2, 2020, found that "the biological and toxicological risks from exposure to degraded PE-PUR foam are of concern...." *See* Exhibit 2 at 7; *see also* Exhibit 6 ("Philips Respironics Inc. (PRI) was made aware in May 2019 that four CPAP units were returned to a service center with degraded sound abatement foam.").

166.  Another internal "Biological Risk Assessment" dated December 10, 2020 – and "conducted as a result of field reports/complaints regarding degraded sound abatement foam in various CPAP and ventilator products" – described the risks that degraded polyurethane foam posed to humans in no uncertain terms:

The cytotoxicity and positive genotoxicity results observed from degraded PE-PUR foam samples indicate a potential patient risk. Potential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure. Overall, based on an understanding of the toxicological significance of the foam degradants and the results of the ISO 10993 testing to include mutagenic responses in both a bacterial and mammalian system, the degraded PE-PUR foam is not considered biocompatible and presents a significant biological risk to those patient populations who are exposed to degraded PE-PUR foam.

*See* Exhibit 2 at 7-8 (emphasis added).

167.   An additional Philips' Biocompatibility Risk Assessment dated January 11, 2021, concurred that degraded PE-PUR foam "presents a significant biological risk to patients," and goes on to state that "[p]otential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure." *Id.* at 8.

168.   Ultimately, in CAPA 7211, Philips concluded that "the cause of the foam degradation condition is long-term exposure to environmental conditions of high temperature combined with high humidity" and restated that "the cause of degradation was due to chemical breakdown of the foam due to exposure to water caused by long-term exposure to environmental conditions." *See* Exhibit 6 at 10.

169.   Based on its investigation, the FDA concluded that Philips' upper management was aware of the foam degradation issues, discussed it at numerous management review meetings, and yet delayed doing anything about it:

> [F]irm management, including management with executive responsibility, were aware of potential foam degradation issues concerning CPAPs, BiPAPs, and Trilogy ventilators since at least 01/31/2020, or earlier, and implemented no further corrective actions until April 2021.

> Polyester polyurethane foam degradation issues concerning CPAPs, BiPAPs, and Trilogy Ventilators were discussed at all [redacted] management review meetings, since the 2019 [redacted], dated 01/31/2020 . . . . Additionally, your firm [Philips] became aware of this issue and related field complaints in at least 2015 or earlier.

*See* Exhibit 2 at 24.

V.     PHILIPS CONSISTENTLY MARKETED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE EVEN WHEN IT KNEW OF THE PROBLEMS WITH PE-PUR FOAM DEGRADATION AND ASSOCIATED HEALTH RISKS.

A.     Philips Never Hinted at the Dangerous Condition of the Recalled Devices.

170.   At no point prior to April 2021, when Philips first disclosed foam issues to its shareholders, did Philips even hint that there was a

dangerous condition in its recalled CPAP, BiPAP, and ventilator devices. Instead, Philips held itself out as a trusted brand and "global leader in the sleep and respiratory markets." Koninklijke Philips N.V. (2004-2023). *Breathe easier, sleep more naturally: innovation and you.* Available online at http://www.respironics.com/product_library (last accessed Aug. 30, 2023). Its branding promises consumers that they will "[b]reath easier, sleep more naturally[.]" *Id.* Philips further assures consumers that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind," and that its "quality systems reflect [Philips'] commitment to providing enhanced patient comfort," among other things. *Id.* And it has long advertised its CPAP and BiPAP Machines as "clinically proven" treatment for sleep disorders.

171.  Philips boasts that it has the "most prescribed CPAP systems by U.S. sleep physicians." Koninklijke Philips N.V. (2004-2023). *Simplified. Intuitive. Connected.* Available online at https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy (last accessed Aug. 30, 2023).

B.    Philips Sold its Humidifier Accessory Allowing Warm Storage Conditions and Contributing to Humidity of the Foam.

172.  Philips sold humidifiers to accompany its CPAP devices, especially the DreamStation, stating in the humidifier's User Manual under the heading "Intended Use": "The DreamStation Heated Humidifier is an accessory for the Philips Respironics DreamStation therapy devices to provide moisture to the patient circuit."

173.  The humidifier manual quoted above had, under the heading "DreamStation Heated Humidifier Specifications" had environmental specifications that included an "Operating Temperature: 5° to 35° C (41° to 95° F)" as well as "Storage Temperature: -20° to 60° C (-4° to 140° F)" and "Relative Humidity (operating & storage): 15 to 95% (non-condensing)." *Id.* at 12.

174.  Philips provided the humidifier option explaining in the DreamStation User Manual that "[y]ou can use the heated humidifier and the heated tube with your device. They are available from your home care provider. A humidifier may reduce nasal dryness and irritation by adding moisture to the airflow." *Id.* at 22.

175.  Philips not only knew but recommended the use of the humidifier, and also advised that the device could be stored in a room as warm as 140° F despite their knowledge that warm, hot and humid

conditions contributed to rapid degradation of its sound insulating foam.

VI.    PHILIPS FINALLY RECALLED ITS DEFECTIVE DEVICES CONTAINING HAZARDOUS PE-PUR FOAM, BUT ONLY AFTER LAUNCHING ITS NEWEST DEVICE WITHOUT PE-PUR FOAM.

A.    Prior to the Recall, in April and May 2021, Philips Launched the DreamStation 2 (which does not contain PE-PUR foam).

176.    Two months prior to the Recall, Philips announced on April 13, 2021, that it was launching the DreamStation 2, a next-generation machine in its DreamStation product family. The DreamStation 2 does not contain PE-PUR foam.

177.    Philips, acting with willful, wanton, and reckless disregard for the safety of its consumers, chose to defer even warning patients about the foam degradation, particle debris and off gassing of toxic fumes, and also deferred the recall until such time as it had its new product commercially available so as to not lose market share to competitors.

178.    Not coincidentally, less than two weeks after its launch of the DreamStation 2, on April 26, 2021, Philips announced that its previous generation DreamStation products and other Recalled Devices posed serious health risks to users and, in the same release, Philips started trying to convince consumers to purchase and use its new DreamStation 2 device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone,* and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. **Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected.** Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.

44

Koninklijke Philips N.V. (Apr. 26, 2021). *Philips' First-Quarter Results 2021.* Available online at https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (accessed Aug. 30, 2023).

B.    Testing Continued to Confirm the Recalled Devices were Defective and the FDA received additional MDRs.

179.    Even as it launched the DreamStation 2 device and announced publicly that its previous generation DreamStation products posed serious health risks to users, Philips continued to conduct tests that confirmed some of its breathing products were defective.

180.    For example, on May 17, 2021, Ken Cole from RJ Lee, an industrial forensics analytical laboratory and scientific consulting firm, produced a presentation analyzing the foam in Philips' Trilogy EVO devices. The presentation states that the investigation was "prompted by staff observation of color variance across both current production and previous builds." See Exhibit 18 at WTB000003 (RJ Lee Analysis Review of Trilogy EVO Foam).

181.    The analysis involved six samples of foam, two from units built in 2018 and four taken from Philips' current production stock in May 2021. *Id.* at WTB00006. Some of the samples from 2021 showed "differing cell structure" which is an "[i]ndication of poor process control." *Id.* at WTB00008. The 2021 foam had "significant contaminants." *Id.* at WTB 000009; *see also* WTB 000010 ("Indication of poor process control and/or contamination."). The foam was supposed to be ether-based, but testing revealed indications that some of the foam was actually ester-based. *Id.* at WTB 000002, WTB000013.

182.    In addition, MDRs associated with the PE-PUR foam breakdown increased significantly. As stated above, manufacturers, such as Philips, are required to submit medical device reports (MDRs) when information reasonably suggests that their device may have caused or contributed to a death or serious injury, or has malfunctioned, and that device or a similar device they manufacture would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. Health professionals, consumers, and patients may voluntarily submit reports of device adverse events and malfunctions to the FDA. *See, e.g.,* 21 C.F.R. § 803.20. From 2011 to April 2021 when Philips first notified the FDA of their intention to conduct a field action due to concerns pertaining to foam degradation (breakdown) in certain ventilators, BiPAP machines, and CPAP machines, Philips submitted only 30 MDRs that they identified as associated with the

PE-PUR foam breakdown and there were no reports of patient injury or death among those 30 MDRs. U.S. Food and Drug Administration *UPDATE: Certain Philips Respironics Ventilators, BiPAP Machines, and CPAP Machines Recalled Due to Potential Health Risks: FDA Safety Communication* (last updated Jun. 2, 2023). Available online at https://www.fda.gov/medical-devices/safety-communications/update-certain-philips-respironics-ventilators-bipap-machines-and-cpap-machines-recalled-due?utm_medium=email&utm_source=govdelivery#mdr (last accessed Aug. 30, 2023). Eight of those reports were from the United States.

183. After Philips notified the FDA of its intention to conduct a field action in April 2021 through July 31, 2022, the amount of MDRs the FDA received increased significantly as did the "reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown." *Id.* (stating "The MDRs received included both mandatory reports from Philips and voluntary reports from health professionals, consumers, and patients."). Specifically, the FDA reported:

- From April 2021 through April 30, 2022, the FDA received more than 21,000 MDRs, including 124 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

- From May 1, 2022, through July 31, 2022, the FDA received more than 48,000 MDRs, including 44 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

184. The FDA continued: "A wide range of injuries have been reported in these MDRs, including cancer, pneumonia, asthma, other respiratory problems, infection, headache, cough, dyspnea (difficulty breathing), dizziness, nodules, and chest pain." *Id.*

C.    Finally, in June 2021, Philips Recalled its Defective Devices.

185. Finally, on June 14, 2021, Philips issued a recall notice directed to its customers in the United States, stating:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE- PUR

foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone,** and high heat and high humidity environments may also contribute to foam degradation.

Therefore, Philips has decided to voluntarily issue a recall notification* to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.

See Exhibit 1.

186.    Philips stated that "[t]he majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family." *Id.* Philips elaborated:

Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions:

For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.

For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

47

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions. *Id.*

187.    Corroborating the dangerous nature of the Recalled Devices, on July 22, 2021, the FDA upgraded Philips' recall of the Recalled Devices to its most serious classification, Class I, which according to the FDA means: "A situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death." U.S. Food and Drug Administration, *Recalls Background and Definitions* (last updated Jul. 31, 2014). Available online at https://www.fda.gov/safety/industry-guidance-recalls/recalls-background-and-definitions (last accessed Aug. 31, 2023).

188.    Philips' Recall announcement instructed users to not use the Recalled Devices because of the health risks. This confirmed the true nature of the products, which at all times were adulterated and worthless.

189.    Philips took similar action with respect to its defective CPAP, BiPAP, and ventilator devices across the globe.

190.    Also, on June 14, 2021, Philips' main competitor, ResMed, issued "[a] message from ResMed's CEO" to the public regarding the Philips Recall. In this notice, ResMed CEO, Mick Farrell, stated that "ResMed devices are safe to use and are not subject to Philips' recall. ResMed devices use a different material than what Philips uses in their recalled machines." ResMed, *HCP Information regarding Philips' recall.* Available online at https://www.resmed.com/en-us/healthcare-professional/other-manufacturer-recall-2021/ (last accessed Aug 31, 2023).

191.  ResMed devices and ventilators use polyether polyurethane or silicone-based foam, not PE-PUR foam, for sound abatement purposes. ResMed, *Information regarding Philips' recall.* Available online at https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Aug. 31, 2023).

VII.  THE MEASURES TAKEN BY PHILIPS TO RECALL THE DEFECTIVE DEVICES WERE INEFFECTIVE.

192.  Philips' CEO, Frans van Houten, stated in the Recall announcement: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety." Koninklijke Philips N.V., *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices.* Available online at https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed Aug. 31, 2023).

193.  But Philips' "recall" was a recall in name only and did not effectively provide patients with notice of the risks of the Recalled Devices nor did it provide them with new Philips CPAP, BiPAP, or ventilator devices.

A.  Many Patients, Providers, and Others Were Not Notified About the Recall.

194.  On March 10, 2022, the FDA issued a Notification Order under § 518(a) of the FDCA. *See* Exhibit 6. The Notification Order stated that the "FDA has received a number of calls from patients and consumers who contacted FDA to report problems and/or concerns regarding the Recalled Products, but were unaware of the recall and had not been informed of the health risks presented by the Recalled Products." *Id.* at 2.

195.  The FDA estimated that, after nine months of the Recall, "approximately 50% of patients and consumers who have purchased or received the Recalled Products (excluding ventilators) within the last five years (the service life of the devices) have registered with Philips to obtain a replacement device." *Id.* But it was "unclear whether the remaining patients and consumers have not registered because they are unaware of the need to register, or because they do not want or need a replacement device from Philips." *Id.*

49

196. The FDA surveyed 182 consignees to determine whether they had been notified of the Recall and found 28 "who had reported to FDA that they were not aware of the recall." *Id.* The FDA reported its results to Philips on September 8, 2021 and October 29, 2021, and Philips did not respond. On November 22, 2021, Philips stated that it had notified 23 of the 28 consignees of the Recall, but Philips did not "indicate whether the consignees identified by FDA had been sent notification before, or only after, they had been identified by FDA as being unaware of the recall." *Id.* Moreover, Philips' evidence of notification consisted of delivery confirmation receipts, reflecting that written correspondence was delivered to the consignees. As the FDA explained, "[t]ypically, firms demonstrate the effectiveness of its recall communications through evidence more meaningful than a delivery confirmation receipt, such as a returned response form or a documented telephone conversation." *Id.* at 3.

197. Throughout the Recall, the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient" and has expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products." *Id.*

198. Noting "Philips' failure to timely provide effective notice to health professionals who prescribe or use the Recalled Products and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products," the FDA issued an order under Section 518(a) of the FDCA ordering Philips to "notify all health professionals who prescribe or use the Recalled Products, and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products **within the next 45 days**[.]"*Id.* at 4 (emphasis in original).

B.    Philips' Repair/Replacement Program Has Been Extremely Slow.

199. Those patients who registered their Recalled Devices with Philips for the Recall did not immediately receive replacement devices and were not told when a replacement device would be provided.

200. As Philips' June 14, 2021 announcement explained:

Repair and replacement program

50

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.

U.S. Food and Drug Administration, *COMPANY ANNOUNCEMENT: Philips Issues a Recall Notification* to Mitigate Potential Health Risks Related to the Sound Abatement Foam Component in Certain Sleep and Respiratory Care Devices.* Available online at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/philips-issues-recall-notification-mitigate-potential-health-risks-related-sound-abatement-foam (last accessed Aug. 31, 2023).

201.  In reality, patients may register their DreamStation Recalled Device with Philips for the Recall, but Philips has not immediately replaced the defective PE-PUR foam in the DreamStation Recalled Devices. Rather, patients have had to wait, sometimes for many months, for Philips to repair or replace their devices, and many patients are still waiting for a replacement device.

202.  As of the date of this Complaint—over a year after the Recall was announced—Philips continues to repair or replace defective DreamStation 1 Recalled Devices. In other words, the Recall remains ongoing.

203.  The replacement program for the Trilogy devices has been even slower. Philips has only just begun the rework of affected Trilogy 100/200 devices and Philips projects that the process will take approximately 12-14 months to complete. Koninklijke Philips N.V., *Voluntary Recall Information Philips Respironics Sleep and*

*Respiratory    Care    devices.*    Available    online    at
https://www.usa.philips.com/healthcare/resource-
catalog/landing/experience-catalog/sleep/communications/src-
update/news/ventilation-news-and-updates (last accessed Aug. 31,
2023).

204.   There is no repair or replacement program for any of the other
       Recalled Devices recalled by Philips.

205.   Due to the design of the Recalled Devices, it is prohibitively difficult
       for patients to remove or replace the PE-PUR foam themselves. Also,
       the FDA warns:

             Do not try to remove the foam from your device. Trying
             to or successfully removing the foam may damage the
             device or change how the device works. It may also
             lead to more foam or chemicals entering the air tubing
             of the device.

       U.S. Food and Drug Administration (last updated Jun. 2, 2023).
       *FAQs on Philips Respironics Ventilator, BiPAP Machine, and CPAP
       Machine Recalls.* Available online at https://www.fda.gov/medical-
       devices/safety-communications/faqs-philips-respironics-ventilator-
       bipap-machine-and-cpap-machine-recalls (last accessed Aug. 31,
       2023).

206.   As a result, the Recall leaves patients without safe, free options.
       Instead, patients may simply be forced to buy Philips' next-
       generation product or a competitor's product—at full price, and
       indeed, thousands of patients have already done so.

207.   Thus, Philips intends to, and is, profiting from its "recall" by selling
       more of its next generation product, the DreamStation 2, whose
       launch appears intentionally timed to coincide with the "recall," to
       affected patients.

208.   The FDA also believes that the Recall is not proceeding quickly
       enough. It recently stated:

             Based on the status of Philips' recall as of the date of
             this letter [May 2, 2022], CDRH believes that, if an
             order were to be issued to Philips under section 518(b),
             the plan submitted by Philips in response to that order
             should provide for significant improvements to Philips'
             ongoing repair and replacement activities to speed the
             pace of remediation and address other deficiencies
             identified by CDRH and communicated to Philips, to

the extent such improvements are achievable by Philips.

See Exhibit 7.

## THE PERSONAL INJURIES SUSTAINED BY PLAINTIFF AS A DIRECT AND PROXIMATE CAUSE OF SUSTAINED USE OF A RECALLED DEVICE

209. In 2018, Plaintiff was referred to Summa Health Sleep Clinic for a sleep study.

210. On the evening of February 7, 2018 to the morning of February 8, 2018, Plaintiff underwent an overnight polysomnogram evaluation at Summa Health Sleep Clinic.

211. On February 12, 2018, Dr. Nader Botros of Summa Health Sleep Clinic diagnosed Plaintiff as suffering from severe obstructive sleep apnea.

212. An order was written for Plaintiff to receive a CPAP machine.

213. On April 4, 2018, Plaintiff received a Philips Respironics DreamStation machine (Model DSX500T11C) with heated humidifier and heated tubing (serial no. J21274897DC54) from Cornerstone Medical Services ("Cornerstone"). A copy of the delivery ticket is annexed hereto and marked as Exhibit 20

214. Defendants, directly or through their subsidiaries or affiliates, designed, manufactured, distributed, and sold the Philips Respironics DreamStation Device prescribed to and received by Plaintiff.

215. Based upon the patient population that Defendants intended its Philips Respironics DreamStation Device to be used by, when Plaintiff used the Device, Plaintiff was an appropriate patient to use the Device.

216. At all times subsequent to the date of first use, Plaintiff used the Device in a normal and expected manner.

217. At the time Plaintiff received the Device, it was in the same condition in all relevant aspects when it left Philips' control.

218. Prior to Plaintiff's receipt of the Device, Philips did not warn patients (including Plaintiff, physicians, its customers, or its sales representatives/distributors) that the Device was known to emit toxic and/or carcinogenic particles from its PE-PUR sound abatement

foam via degradation and/or off-gassing, which could then be directly inhaled by the user and causing severe injury or death.

219.   Plaintiff was never notified of the Philips Respironics medical device recall.

220.   On May 18, 2023, Plaintiff was given a transthoracic echocardiogram complete with contrast evaluation from Summa Health ACH 95 Arch Non-Invasive Cardiology as a routine follow-up to his 2011 diagnosis of a bicuspid aortic valve.

221.   Dr. Wissam Alajani diagnosed Plaintiff as having severe stenosis of the aortic valve.

222.   Dr. Steven M. Heupler, Plaintiff's longtime treating cardiologist, informed Plaintiff that if he experiences any chest pains, he needs to go to the emergency room for evaluation.

223.   On May 23, 2023, Plaintiff began to experience chest pains and went to Summa Health GMC emergency department for evaluation.

224.   After a physical examination performed by Dr. T. Gombash, it was recommended that Plaintiff be admitted to the hospital for a further evaluation.

225.   On May 23, 2023, Plaintiff was admitted to Summa Health Akron City Hospital for further testing.

226.   On May 26, 2026, Dr. Nkem Aziken and assistant Brian Heisler performed an aortic valve replacement with insertion of a 23mm mechanical valve, a triple coronary artery bypass graft, and an endoscopic vein harvest of the left lower extremity.

227.   As a direct result of the artificial aortic valve replacement, Plaintiff is required to be on blood thinners such as Warfarin for the rest of his life.

228.   On June 1, 2023, a permanent pacemaker was inserted into Plaintiff's chest to repress tachycardia that was present since Plaintiff came out of surgery.

229.   On June 2, 2023, Plaintiff was discharged from the hospital.

230.   On June 20, 2023, Plaintiff appeared at a scheduled appointment with Summa Health Cardiothroatic Surgery for a follow-up to his pacemaker device.

231.    During this appointment, Plaintiff was given a device that automatically checks the operation of Plaintiff's internal pacemaker and notifies him if there is a problem that requires medical intervention.

232.    On June 21, 2023, Plaintiff had an appointment with AeroCare for a scheduled replacement of his CPAP machine.

233.    An unknown staff member of AeroCare informed Plaintiff about the Philips Respironics Medical Device recall.

234.    Plaintiff was shocked that he was not notified by Philips about the recall.

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

235.    The running of any statute of limitations has been equitably tolled by Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiff and physicians the true risks associated with the Recalled Devices.

236.    As a result of Defendants' actions, Plaintiff were unaware, and could not have reasonably known or learned through reasonable diligence, that the Recalled Devices were defective and exposed users to the risks and harms set forth here and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

237.    Plaintiff did not have the technical, scientific or medical knowledge and information sufficient to ascertain the cause of their injury prior to learning of the recall and the basis for the recall.

## CAUSES OF ACTION

I.    STRICT LIABILITY—DESIGN DEFECT.

238.    Plaintiff re-alleges and incorporates by reference the allegations set forth throughout the First Amended Complaint as if set forth herein.

239.    At all times mentioned herein, Philips and PolyTech were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, which were defective and unreasonably dangerous.

240.    Plaintiff were foreseeable users of the Recalled Devices and Philips and PolyTech knew that Plaintiff would use the Recalled Devices.

55

241.    The Recalled Devices are defective in design because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release particles and off-gas chemicals, including TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiff using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

242.    Philips and PolyTech knew or should have known that the defective conditions of the Recalled Devices made the Recalled Devices unreasonably dangerous to Plaintiff.

243.    The Recalled Devices were unreasonably dangerous when used by ordinary users, such as Plaintiff, who used the Recalled Devices as they were intended to be used.

244.    The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the Recalled Devices.

245.    The defective condition of the subject Recalled Devices rendered them unreasonably dangerous and/or not reasonably safe, and the devices were in this defective condition at the time they left the hands of Philips and PolyTech. The Recalled Devices reached Plaintiff without substantial change in the condition in which they were designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied, and otherwise released into the stream of commerce.

246.    Plaintiff were not able to discover, nor could they have discovered through the exercise of reasonable diligence, the defective nature of the subject devices. Further, in no way could Plaintiff have known that Philips had designed, developed, and manufactured the subject devices in a way as to make the risk of harm or injury outweigh any benefits.

247.    Safer alternative machines and designs were available which did not have an unreasonable risk of harm that the Recalled Devices and their unsafe PE-PUR foam did; for example, devices that included non-PE-PUR foam and designs that included other types of sound abatement technologies.

248.    At the time the Recalled Devices left Philips' and PolyTech's possession and continuing through when they were used by Plaintiff,

the Recalled Devices were in a condition that made them unreasonably dangerous to Plaintiff.

249. The Recalled Devices used by Plaintiff were expected to, and did, reach Plaintiff without substantial change in the condition in which the Recalled Devices were manufactured, sold, distributed, and marketed by Philips and PolyTech.

250. At all relevant times, Plaintiff used the Recalled Devices in the manner in which the devices were intended to be used.

251. Philips and PolyTech researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed the defective Recalled Devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Philips is therefore strictly liable for the injuries sustained by Plaintiff.

252. As a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiff has suffered serious and debilitating injuries.

253. In addition, as a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

254. Plaintiff demands judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

II.   STRICT LIABILITY—FAILURE TO WARN.

255. Plaintiff re-alleges and incorporates by reference the allegations set forth throughout the Complaint as if set forth herein.

256. At all times mentioned herein, Philips and PolyTech designed, manufactured, and sold the Recalled Devices.

257. Plaintiff was a foreseeable users of the Recalled Devices.

258. The Recalled Devices are defective because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles, including but not limited to TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiff using the Recalled

Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

259. Philips and PolyTech knew that the defective condition of the Recalled Devices made the devices unreasonably dangerous to users such as Plaintiff.

260. The Recalled Devices were dangerous when used by ordinary users, such as Plaintiff, who used the devices as they were intended to be used.

261. The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the device.

262. Philips and PolyTech knew or should have known of the defects in the Recalled Devices at the time Philips and PolyTech sold or provided the Recalled Devices that were used by Plaintiff.

263. At the time the Recalled Devices left Philips' and PolyTech's possession, the Recalled Devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

264. At the time Plaintiff used the Recalled Devices, the devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

265. The Recalled Devices used by Plaintiff were expected to, and did, reach Plaintiff without substantial change in the condition in which the devices were manufactured, sold, distributed, and marketed by Philips and PolyTech.

266. At all relevant times, Plaintiff used the Recalled Devices in the manner in which the devices were intended to be used.

267. The Recalled Devices are defective because Philips and PolyTech failed to warn or instruct that the PE-PUR foam in the Recalled Devices can degrade and off-gas dangerous and carcinogenic chemicals and particles, posing a serious risk to users.

268. Philips and PolyTech further failed to warn or instruct that the Recalled Devices had been adequately or properly tested.

269. The warning and instructions that accompanied the Recalled Devices failed to provide the level of information that ordinary

consumers, including Plaintiff, would expect when using the product in a manner reasonably foreseeable to Philips and PolyTech.

270. Philips and PolyTech further failed to warn or instruct that the Recalled Devices, when used in conjunction with the Accessory Humidifiers, would hasten the degradation of the foam and make the Recalled Devices especially dangerous.

271. Philips and PolyTech further failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions, and that warm temperatures and humidity would hasten the degradation of the foam and make the Recalled Devices especially dangerous.

272. Philips and PolyTech further failed to warn or instruct that the Recalled Devices should not be used in conjunction with the SoClean ozone cleaning system which Philips now claims can hasten or cause the degradation of the foam and make the Recalled Devices especially dangerous.

273. Had Plaintiff received proper or adequate warnings or instructions as to the risks of using the Recalled Devices, Plaintiff would not have used the Recalled Devices.

274. Had Plaintiff received proper or adequate warnings or instructions as to the storage, climate and cleaning conditions and protocols, they would have heeded such warnings to mitigate the risk of premature foam degradation.

275. Philips and PolyTech researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed the defective Recalled Devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Philips and PolyTech are therefore strictly liable for the injuries sustained by Plaintiff.

276. As a direct and proximate cause of Philips' and PolyTech"s conduct, Plaintiff has suffered serious and debilitating injuries.

277. Plaintiff demands judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

III.    STRICT LIABILITY—MANUFACTURING DEFECT.

278.    Plaintiff re-alleges and incorporates by reference the allegations set forth throughout the Complaint as if set forth herein.

279.    At all times mentioned herein, Philips and PolyTech were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, which were unreasonably dangerous, unsafe and defective in their manufacturing when they left Philips' and PolyTech's possession.

280.    The Recalled Devices were expected to, and did, reach the Plaintiff without substantial change or adjustment to their mechanical function and condition in which they were sold.

281.    Plaintiff used the Recalled Devices as directed and for the purpose for which they were intended.

282.    The Recalled Devices are inherently dangerous for their intended used due to manufacturing defects. Philips and PolyTech therefore are strictly liable.

283.    Philips failed to ensure that a subset of the purchased, or otherwise received, Recalled Devices and services conformed to specified requirements.

284.    Specifically, Philips used defective, incorrect and non-specified PE-PUR, raw foam product, not intended for use in Recalled Devices, to manufacture some of the Recalled Devices including certain recalled Trilogy Evo ventilators.

285.    This incorrect and non-specified PE-PUR foam was sourced from Philips' raw foam supplier, used in the muffler assembly of the affected Recalled Devices, including Trilogy Evo ventilators, and resulted in non-conforming Recalled Devices being approved, released and distributed by Philips to Plaintiff.

286.    Per design specifications, this foam was required to be polyether based, not polyester based foam.

287.    Upon information and belief, the Recalled Devices contain a manufacturing defect that differed from other typical units of the same product line. Philips sold the Recalled Devices in this defective condition.

288.    Philips failed to conduct proper and regular quality control sampling and testing.

60

289.    The Recalled Devices, as manufactured, were unsafe and unreasonably dangerous to Plaintiff.

290.    The Recalled Devices did not perform as safely as an ordinary consumer would expect.

291.    Philips and PolyTech knew or should have known of the manufacturing defects and the risks of serious bodily injury exceeded the benefits associated with the Recalled Devices.

292.    Furthermore, the Recalled Devices and their defects presented an unreasonable dangerous risk beyond what the ordinary consumer would reasonably expect.

293.    As a direct and proximate cause of Philips' and PolyTech's manufacturing defect, Plaintiff has suffered serious and debilitating injuries.

294.    Plaintiff demands judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

IV.    GENERAL NEGLIGENCE.

295.    Plaintiff re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

296.    Philips and PolyTech owed a duty to Plaintiff to use and exercise reasonable and due care in the design, materials procurement, manufacturing, testing, distribution, labeling, marketing, warnings, instructions for use and storage, disclosures, regulatory compliance, and sale of the Recalled Devices.

297.    Philips and PolyTech owed a duty to Plaintiff to ensure that the Recalled Devices they sold in the United States were safe, did not expose patients using the devices to toxic substances, and/or complied with current best manufacturing practices and regulatory requirements.

298.    Philips and PolyTech owed a duty of care to Plaintiff; because they were the foreseeable, reasonable, and probable users of the Recalled Devices. Philips and PolyTech knew, or should have known, that the Recalled Devices were not safe, exposed their users to toxic and carcinogenic compounds, and/or did not comply with best manufacturing practices and regulatory requirements. Philips and

PolyTech were in the best position to uncover and remedy these shortcomings.

299.    Philips and PolyTech negligently designed and manufactured the Recalled Devices, causing patients using the Recalled Devices to be exposed to the Foam Toxins and degraded particulate matter which are harmful, carcinogenic and/or toxic.

300.    Philips and PolyTech failed to discharge their duties of reasonable care. Philips and PolyTech inadequately conducted and/or oversaw the design, materials procurement, manufacturing, testing, labeling, distribution, marketing, warnings, disclosures, instructions for use and storage, regulatory compliance and sale of the Recalled Devices. Philips and PolyTech knew or should have known that the aforesaid wrongdoing would damage Plaintiff.

301.    Philips and PolyTech negligently failed to promptly and immediately warn and disclose to Plaintiff, and the medical and regulatory communities, of the potential and actual danger posed by the PE-PUR foam in the Recalled Devices as soon as it was discovered, delaying notice of this harmful and potentially fatal toxic exposure to carcinogens and thus causing continued exposure to the carcinogenic and/or hazardous compounds, and delaying cessation of use, necessary medical testing, examinations, surveillance, and treatment.

302.    Philips and PolyTech failed to discharge their duties of reasonable care. Philips and PolyTech failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions; and that warm temperatures and humidity would hasten the degradation of the foam, and make the Recalled Devices especially dangerous.

303.    Philips' and PolyTech's negligent or grossly negligent conduct created and then exacerbated an unreasonable and dangerous condition for Plaintiff.

304.    Philips and PolyTech acted with recklessness and willful and wanton disregard for the health of Plaintiff.

305.    Philips' and PolyTech's unreasonable, negligent actions and inactions were taken or not taken with willful and wanton disregard for the health of Plaintiff and created a foreseeable risk of harm to Plaintiff.

306.    As a direct and proximate result of Philips' and PolyTech's negligence, Plaintiff has suffered serious and debilitating injuries.

307. Plaintiff demands judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

V.    NEGLIGENT FAILURE TO WARN.

308. Plaintiff re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein.

309. At all times mentioned herein, Philips and PolyTech designed, manufactured, and sold the Recalled Devices.

310. At all times relevant to this action, Philips and PolyTech had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Recalled Devices with reasonable and due care for the safety and well-being of Plaintiff, who were subject to and used the devices.

311. In addition, Philips and PolyTech owed a duty of care to Plaintiff because, among other things, it had superior knowledge with respect to the Recalled Devices including, but not limited to critical safety issues associated with foam degradation, off-gassing, and related health risks.

312. Plaintiff was foreseeable users of the Recalled Devices.

313. The Recalled Devices are defective because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles, including but not limited to TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiff using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, , inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

314. The foreseeable risks of using the Recalled Devices significantly outweigh the benefits conferred upon patients using the Recalled Devices.

315. Philips and PolyTech knew that the defective condition of the Recalled Devices made the devices unreasonably dangerous to users such as Plaintiff.

63

316.    The Recalled Devices were unreasonably dangerous when used by ordinary users, such as Plaintiff, who used the devices as they were intended to be used.

317.    The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the device.

318.    Philips and PolyTech knew or should have known of the defects in the Recalled Devices at the time Philips sold or provided the Recalled Devices that were used by Plaintiff.

319.    At the time the Recalled Devices left Philips' and PolyTech's possession and continuing through when they were used by Plaintiff, the Recalled Devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

320.    The Recalled Devices used by Plaintiff were expected to, and did, reach Plaintiff without substantial change in the condition in which the devices were manufactured, sold, distributed, and marketed by Philips and PolyTech.

321.    At all relevant times, Plaintiff used the Recalled Devices in the way the devices were intended to be used.

322.    Philips and PolyTech breached their duty to Plaintiff by failing to warn of the risks and dangers of using the Recalled Devices as they are intended to be used. The Recalled Devices did not contain warnings of the risks of the PE-PUR foam and the risks of degradation, off-gassing, and related health risks.

323.    Philips and PolyTech further breached their duty to Plaintiff because it failed to warn or instruct that the Recalled Devices had not been adequately or properly tested.

324.    Philips and PolyTech further failed to warn or instruct that the Recalled Devices, when used in conjunction with the Accessory Humidifiers would hasten the degradation of the foam and make the Recalled Devices especially dangerous.

325.    Philips and PolyTech further failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions; and that warm temperatures and humidity would hasten the degradation of the foam, and make the Recalled Devices especially dangerous.

326.    The warnings and instructions of the Recalled Devices did not provide the amount of information that ordinary consumers, including

64

Plaintiff, would expect when using the devices in a reasonably foreseeable manner.

327.  Had Plaintiff received proper or adequate warnings or instructions as to the risks of using the Recalled Devices, Plaintiff would not have used the Recalled Devices.

328.  Had Plaintiff received proper or adequate warnings or instructions as to the storage, climate and cleaning conditions and protocol, they would have heeded such warnings to mitigate the risk of premature foam degradation.

329.  As a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiff has suffered serious and debilitating injuries.

330.  Plaintiff demands judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

VI.  NEGLIGENT RECALL/NEGLIGENT FAILURE TO RECALL

331.  Plaintiff re-alleges and incorporates by reference the allegations set forth throughout the First Amended Complaint as if set forth herein.

332.  Despite being aware of the Defect in the Recalled Devices as far back as 2008, Philips did not initiate a recall of the Recalled Devices until June 14, 2021.

333.  At all times relevant hereto, Philips manufactured, marketed, distributed, and sold the Recalled Devices.

334.  As set forth in detail above, as far back as 2008 (and in no event later than 2015), Philips knew or reasonably should have known that the Recalled Devices were defective and exposed users to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam in the Recalled Devices.

335.  Despite that knowledge, Philips did not attempt to recall or retrofit the Recalled Devices prior to June 14, 2021, long after any reasonable manufacturer, distributor and/or seller under the same circumstances would have instituted a recall or retrofitted the Recalled Devices.

336.  Because of the delay in instituting a recall, Plaintiff continued to use and pay for the Recalled Devices when, without their knowledge, they were being exposed to substantial health risks.

337.    Had Philips instituted a recall when the risks to potential users of using the Recalled Devices were first made clear, Plaintiff would have not used or paid for the defective devices and would have sought alternative methods to treat their breathing-related illnesses.

338.    Philips was aware that Plaintiff would make such a choice. That is why Philips waited until it announced the launch of the DreamStation 2, which does not contain PE-PUR foam, before it publicly disclosed that its previous generation of DreamStation products and other Recalled Devices posed serious health risks to users, and before Philips finally instituted a recall.

339.    Even after Philips finally announced it was instituting a voluntary recall of the Recalled Devices, it implemented the Recall negligently.

340.    Royal Philips took charge of and responsibility for the Recall. Royal Philips has interfaced with regulatory agencies in the U.S. and worldwide but has not adequately notified users and their doctors about the recall or the options for obtaining a replacement device.

341.    First, when the Recall was announced on June 14, 2021, Philips did not adequately provide notice to users or their doctors about the risks of using the Recalled Devices, nor did Philips offer users of the Recalled Devices any option for a replacement device. In fact, the FDA issued a Notification Order to Philips under § 518(a) of the FDCA, documenting that the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient," and has expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."

342.    Then, when Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States, Philips estimated that it would take a year to complete the program. Philips was aware that this time frame was untenable for patients, many of whom relied on the machines to treat medical conditions.

343.    In addition, DreamStation customers were not given any specifics as to how the replacement program would work nor were they told when they might receive a replacement device (a significant factor for users who, again, relied on the machines for medical conditions) nor were their treating physicians given any meaningful guidance by Philips.

344. Still, the repair/replacement program only applied to affected DreamStation devices and did not impact any of the other Recalled Devices. Later, Philips instituted a repair program for the Trilogy devices, which has only just recently begun.

345. Despite the estimated one-year timeline originally announced by Philips to replace recalled DreamStation devices, Philips has not performed the Recall according to its own projections, and many users are still waiting for repaired or replaced devices.

346. In issuing a voluntary recall, Philips assumed duties to exercise reasonable care in issuing and implementing the Recall. Philips' conduct constitutes a breach of its duties by failing to adequately warn and notify users of the risks of using the Recalled Devices and failing to promptly replace the Recalled Devices.

347. As a result of Philips breach of duty, Plaintiff continued to use Recalled Devices.

348. At all relevant times, Plaintiff used the Recalled Devices in the manner in which the devices were intended to be used

349. As a direct result of Philips' breach of duty, Plaintiff have suffered serious and debilitating injuries.

350. Plaintiff demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

VII.    BREACH OF EXPRESS WARRANTY.

351. Plaintiff reallege and incorporate by reference all preceding allegations as though fully set forth herein.

352. Philips warranted that all of the Recalled Devices "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

353. Philips breached this express warranty in connection with the sale and distribution of Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth here, rendering them unsuitable and unsafe for personal use.

67

354.    Had Plaintiff and the Class known the Recalled Devices were unsafe for use, they would not have purchased them.

355.    Philips has breached its warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

356.    To the extent privity may be required, Plaintiff and the Class can establish privity with Philips or alternatively, Plaintiff can establish that they fall into an exception to a privity requirement. Plaintiff and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

357.    Alternatively, Plaintiff and the Class were foreseeable third-party beneficiaries of Philips sale of the Recalled Devices.

358.    Plaintiff is not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year. As a direct and proximate result of Philips' breach of its express warranty, Plaintiff has sustained damages in an amount to be determined at trial.

359.    Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff reasonably expected, at the time of purchase, that the Recalled Devices were safe for its ordinary and intended use.

VIII.    BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY.

360.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

361.    By operation of law, Philips, as the manufacturer of the Recalled Devices and as the provider of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiff and the Class that the Recalled Devices were of merchantable quality and safe for their ordinary and intended use.

362.    Such implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in Ohio. *See* Ohio Rev. Code Ann. §§ 1302.27, et seq.

363.    Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal,

contained latent defects as set forth herein rendering them unsuitable and unsafe for personal use.

364. Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth here rendering them unsuitable and unsafe for personal use.

365. Had Plaintiff known the Recalled Devices were unsafe for use, he would not have purchased or leased them.

366. To the extent privity may be required, Plaintiff and the Class can establish privity with Philips or alternatively, Plaintiff can establish that they fall into an exception to a privity requirement. Plaintiff and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

367. Alternatively, Plaintiff and the Class were foreseeable third-party beneficiaries of Philips' sale of the Recalled Devices.

368. Plaintiff is not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

369. Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

370. As a direct and proximate result of Philips' breach of the implied warranty of merchantability, Plaintiff has sustained damages in an amount to be determined at trial.

IX.    VIOLATION OF 15 U.S.C. § 2301, THE MAGNUSON-MOSS FEDERAL WARRANTY ACT.

371. Plaintiff reallege and incorporate by reference all preceding allegations as though fully set forth herein.

372. The Recalled Devices constitute "consumer products" as defined in 15 U.S.C. § 2301.

373. Plaintiff and the members of the Class are "consumers" as defined in 15 U.S.C. § 2301.

374.  Philips is a "supplier" of the Recalled Devices as defined in 15 U.S.C. § 2301.

375.  Philips is a "warrantor" as defined in 15 U.S.C. § 2301.

376.  The warranties made by Philips pertained to consumer products costing the consumer more than five dollars, see 15 U.S.C. § 2302(e).

377.  The Recalled Devices were defective when they came off Philips' assembly lines and at all subsequent times (including at the times of sale and/or delivery to Plaintiff and the members of the Class) because the defective foam and design make them dangerously unsafe.

378.  As a result, the Recalled Devices were worth less (nothing or less than nothing) at the time of their sales than the prices paid for them.

379.  Plaintiff would not have purchased or accepted the Recalled Devices had they known the machines were dangerously defective.

380.  Philips violated the Magnuson-Moss Federal Warranty Act by failing to comply with the express warranties they made to Plaintiff and the members of the Class. Philips violated the Magnuson-Moss Federal Warranty Act by failing to comply with the implied warranties they made to Plaintiff and the members of the Class.

381.  Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the Magnuson-Moss Federal Warranty Act claims in this Count are procedurally and substantively unconscionable and otherwise unenforceable under federal law and applicable state common law.

382.  Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the claims in this Count is tolled under equitable doctrines.

383.  Plaintiff sustained injuries and damages as a proximate result of Philips' violation of its express and implied warranties, and are entitled to legal and equitable relief against Philips, including economic damages, rescission or other relief as appropriate, including compensatory damages consisting of: (a) the difference between the values of the Recalled Devices as warranted (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages.

384. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other members of the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by them in connection with the commencement and prosecution of this action.

## X.    COMMON LAW FRAUD.

385. Plaintiff reallege and incorporate by reference all preceding allegations as though fully set forth herein.

386. Philips knew that the Recalled Devices posed serious health risks to users.

387. Philips failed to advise Plaintiff and the Class of the material fact that the Recalled Devices posed serious health risks to users. Philips concealed information regarding the adverse health effects posed by the Recalled Devices from Plaintiff and the Class members. Philips misrepresented Plaintiff that the Recalled Devices were safe for use.

388. Philips was under a duty to disclose to Plaintiff the serious health risks posed to users because: (a) Philips was in a superior position to Plaintiff and the Class members to know the risks associated with the use of the Recalled Devices; (b) Philips was in a superior bargaining position to Plaintiff and the Class members in determining whether or not to disclose or conceal information regarding the Recalled Devices in its packaging, labels, advertising, and websites; (c) Philips made representations regarding the safety of the Recalled Devices and had a duty to fully disclose all facts related to the serious health risks to users posed by the Recalled Devices, once Philips became aware of such serious health risks; (d) Philips knew that the Plaintiff and the Class members could not reasonably have been expected to learn or discover the serious health risks posed by use of the Recalled Devices prior to purchasing the Recalled Devices, given the representations, concealed material information, and omissions by Philips in its packaging, labels, advertising, and websites; and (e) Philips has a duty to disclose information related to the health and safety of its products.

389. Philips intentionally, knowingly, and recklessly allowed its packaging, labels, advertisements, promotional materials, and websites to mislead Plaintiff to believe that the Recalled Devices were safe for use.

390.  Philips knew that its omissions, concealment, and representations in its packaging, labels, advertisements, promotional materials, and websites regarding the Recalled Devices were false, deceptive, inadequate, and misleading, and that the Recalled Devices contained PE-PUR Foam and thus could cause adverse health effects to users of the Recalled Devices.

391.  Philips concealed and misrepresented material information regarding the serious health risks posed to users of the Recalled Devices from Plaintiff by failing to include material information in its packaging, labels, advertisements, promotional materials, and websites.

392.  The information undisclosed and concealed by Philips to Plaintiff was material, as a reasonable consumer would find information regarding serious adverse health risks associated with the use of the Recalled Devices important when deciding whether to purchase the Recalled Devices.

393.  As a result of such deceptive packaging, labels, advertisements, promotional materials, and websites, Plaintiff justifiably and reasonably believed the Recalled Devices were safe for use.

394.  Philips intentionally, knowingly, and recklessly made these material omissions and misrepresentations, and concealed material information regarding the adverse health risks associated with the Recalled Devices in its packaging, labels, advertisements, promotional materials, and websites regarding the Recalled Devices to induce Plaintiff to purchase the Recalled Devices.

395.  Plaintiff and the Class members relied on Philips' deceptive packaging, labels, advertisements, promotional materials, and websites and purchased and used the Recalled Devices to their detriment. Given the deceptive way Philips advertised, represented, and promoted the Recalled Devices, such reliance by Plaintiff was reasonable and justified.

396.  As a direct and proximate result of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiff has suffered actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost

to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages.

XI.  VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE CHAPTER 1345.

397.  Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

398.  The Ohio Consumer Sales Practices Act was created to protect Ohio consumers from unfair or deceptive business practices.

399.  Philips has intentionally engaged in deceptive and unfair acts or practices, false promises and misleading and unconscionable commercial practices, including misleading omissions of material fact, in connection with the advertisement, marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

400.  Plaintiff purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ohio Rev. Code §§1345.02(A); 1345.03(A). Plaintiff acted as a reasonable consumer would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

401.  Accordingly, pursuant to the aforementioned statutes, Plaintiff is entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, Plaintiff and Ohio Subclass members are entitled to cost of suit and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary, and all such other relief as the Court deems proper.

XII.  VIOLATIONS OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ("RICO") ACT.

402.  Plaintiff realleges and incorporate by reference all preceding allegations as though fully set forth herein.

73

403. This claim is brought by Plaintiff against Philips and PolyTech (within this claim, the "RICO Defendant(s)") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

404. Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

405. At all relevant times, each RICO Defendant is and has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

406. Philips and PolyTech each violated 18 U.S.C. § 1962(c) and injured the business or property of the Plaintiff and the Nationwide Class. Plaintiff are each a "person," as defined in 18 U.S.C. § 1961(3). Further, Plaintiff have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

A. The Philips-Polytech Enterprise was an Association-In-Fact Enterprise with a Common Purpose to Conceal the Health and Safety Risks of the Recalled Devices.

407. Philips and PolyTech conducted or participated in the affairs of an "association-in-fact enterprise"—i.e., the Philips-PolyTech Enterprise —through a pattern of racketeering activity (stemming from the predicate racketeering acts of mail and wire fraud) in violation of 18 U.S.C. § 1962(c). The Philips-PolyTech Enterprise engaged in this pattern of illegal activities in furtherance of its common purpose to unlawfully defraud and mislead the FDA, prescribers, third-party payors, hospitals, and consumers about the safety of the Recalled Devices. In so doing, each of the RICO Defendants knowingly conducted and participated in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

408.. The Philips-PolyTech Enterprise included Philips and PolyTech, as well as other nonparty individuals and corporations, including Paramount Die. Discovery will likely reveal additional members of the Philips-PolyTech Enterprise that are not currently known to Plaintiff.

409. Each RICO Defendant participated in the Philips-PolyTech Enterprise, played a distinct role in furthering the enterprise's

common purpose of increasing profits and knowingly concealed information about the safety of the Recalled Devices.

410.   Specifically, the RICO Defendants worked together to coordinate the enterprise's goals, conceal the existence of the enterprise, and conceal their individual roles. Further, each of the RICO Defendants were linked through their business relationships and continuing coordination of activities. This business relationship facilitated the formation of a common purpose among the RICO Defendants, who each agreed to participate in the conduct of the Philips-PolyTech Enterprise. Specifically, each RICO Defendant played a critical role in producing the Recalled Devices, concealing the Recalled Devices' defective condition and selling the devices to third-party payors, hospitals and consumers.

411.   At all relevant times, the Philips-PolyTech Enterprise: (i) had an existence that was separate and distinct from the individual RICO Defendants and their members; (ii) was separate and distinct from the pattern of racketeering in which the individual RICO Defendants engaged; (iii) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO Defendants; (iv) was characterized by business relationships between and among each RICO Defendant; and (v) had sufficient longevity for the enterprise to pursue its common purpose and function as a unit.

412.   The RICO Defendants participated in the conduct of the Philips-PolyTech Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud). This was done to increase profits by hiding and misrepresenting the dangers associated with the Recalled Devices.

413.   The Philips-PolyTech Enterprise engaged in and affected interstate commerce because it manufactured, marketed, sold, or provided the Recalled Devices to millions of individuals throughout the United States.

B.   The Philips-PolyTech Enterprise had a Common Purpose.

414.   The Philips-PolyTech Enterprise came together for the common purpose to perpetuate a fraudulent scheme to conceal from patients, prescribers, third-party payors, hospitals, and the FDA the true health and safety risks associated with the Recalled Devices and PE-PUR foam. This concealment was aimed to allow the Enterprise

participants to profit, continue to profit, and retain profits from the sale of Recalled Devices.

415. By knowingly concealing and minimizing the defect, the RICO Defendants could represent the Recalled Devices as being safe and effective, including through omitting information to the contrary. This false representation resulted in significant sales and revenue generated from the sale of defective Recalled Devices. Concealing and minimizing the defect also allowed the RICO Defendants to avoid or limit the substantial costs and reputational harm associated with a recall, repair or replacement of the Recalled Devices.

416. Each of the RICO Defendants profited, directly or indirectly, from the scheme. These profits were substantially greater than they would have been if the defect and true risks of the Recalled Devices had been disclosed.

   a.   Philips profited directly from the sales of the Recalled Devices, which resulted from the Enterprise's deception of consumers, prescribers, third-party payors, hospitals, and the FDA.

   b.   Likewise, PolyTech profited from the sale of the Recalled Devices that contained the PE-PUR foam cut and sold by PolyTech.

   c.   Paramount Die likewise profited from the sale of the Recalled Devices that contained the PE-PUR foam modified by Paramount Die for use in the Recalled Devices.

417. Because the RICO Defendants' ability to profit from this scheme depended on the prescription and sale of the Recalled Devices, the Philips-PolyTech Enterprise needed to ensure complete allegiance to a false premise: that the Recalled Devices were safe and effective. For this scheme to work, it was essential for the Philips-PolyTech Enterprise to conceal the Defect from the FDA, because the agency could otherwise investigate, recall the devices, and notify the public of the Defect. The expense of a recall and the resulting inability to sell the defective Recalled Devices would undermine the profitability of the scheme.

418. This common purpose served the interests of all of the RICO Defendants.

C.     The Philips-PolyTech Enterprise had an Ongoing Organization.

419.   The RICO Defendants, in concert with the other Enterprise participants, created and maintained systematic links toward this common purpose, i.e., to manufacture, market, and sell the Recalled Devices while concealing their health and safety risks.

420.   The Philips-PolyTech Enterprise continued for several years, at least from 2015 to the present. During this time, the RICO Defendants remained stable, with Philips, PolyTech, and Paramount Die actively producing, marketing, and selling the defective Recalled Devices.

421.   The RICO Defendants exerted control over the Enterprise and have coordinated and participated in the operation or management of Enterprise affairs. At the same time, the RICO Defendants were and are separate entities existing outside the Enterprise. The RICO Defendants' independent existences are demonstrated by the following:

       a.     During the relevant period, Philips contemporaneously designed, manufactured and sold many medical devices and products separate and apart from the Recalled Devices.

       b.     During the relevant period, PolyTech contemporaneously sold and distributed many other noise abatement products aside from the PE-PUR foam used in the Recalled Devices.

       c.     During the relevant period, Paramount Die contemporaneously provided cutting services for rubber, foam, plastic and other materials apart from the PE-PUR foam used in the Recalled Devices.

422.   The RICO Defendants also occupied delineated roles that furthered the organization's goals. Each RICO Defendant performed important but separate roles within the Philips-PolyTech Enterprise organization.

423.   Philips participated in the conduct of the Enterprise when it, among other things:

       a.     Designed, marketed, manufactured, and sold the Recalled Devices;

b.    Coordinated with PolyTech and Paramount Die to select and order the PEPUR foam to use for sound abatement in the Recalled Devices;

c.    Downplayed, ignored, and failed to investigate issues of foam degradation in its devices using PE-PUR foam for sound abatement, including failing to perform and document required risk analyses;

d.    Obscured and minimized the defect in the Recalled Devices by misleadingly blaming other factors, such as the use of ozone cleaners, when faced with recurring evidence of serious problems (e.g., including consumer complaints of "black dust" and related issues);

e.    Communicated and coordinated regularly with PolyTech about known instances of foam degradation and consumer complaints for devices with PE-PUR foam, beginning at least as early as 2015;

f.    Failed to implement a preventative maintenance procedure for Trilogy ventilator devices with PE-PUR foam that another Philips entity successfully instituted;

g.    Concealed that the Recalled Devices were equipped with defective PE-PUR foam that could degrade and emit dangerous VOCs; and

h.    Collected revenue flowing from the sale of the Recalled Devices.

424.   PolyTech participated in the conduct of the Enterprise when it, among other things:

a.    Obtained bulk PE-PUR foam from Burnett, and cut, shipped, and sold PEPUR foam for installation in the Recalled Devices;

b.    Disregarded specific warnings from Burnett about PE-PUR foam, and continued to obtain and sell the defective PE-PUR foam for use in the Recalled Devices;

c.    Relayed communications from Philips to Burnett, including as to questions about the PE-PUR foam

chemistry and the safety risks, field issues, and testing for the Recalled Devices;

d.    Concealed that the Recalled Devices were equipped with defective PE-PUR foam that could degrade and emit dangerous VOCs;

e.    Misrepresented the PE-PUR foam in the Recalled Devices to be effectively resistant to heat and humidity;

f.    Communicated with Philips about known instances of foam degradation and consumer complaints for devices with PE-PUR foam; and

g.    Collected revenue flowing from the sale of the Recalled Devices.

425.   In addition, each of the RICO Defendants separately ensured that the FDA, prescribers, third-party payors, hospitals, and consumers did not discover the defect in the Recalled Devices.

426.   Without the RICO Defendants' willing participation in the conduct above, the Enterprise's scheme and common course of conduct would have been unsuccessful.

427.   The participants' dedication of personnel to the Enterprise's scheme further evidences the ongoing structure of the Enterprise. For example,

a.    PolyTech dedicated its employees Bob Marsh and Bonnie Peterson to work with Philips relating to the PE-PUR foam in the Recalled Devices, and to coordinate their communications with Burnett on behalf of Philips. Ms. Peterson served as a regular point of contact for technical questions about the PE-PUR foam, while Mr. Marsh liaised with Philips' personnel on foam degradation issues and questions. Likewise, PolyTech dedicated its employee Michael Haupt to coordinate with Paramount Die.

b.    Philips, for its part, dedicated key personnel to the Recalled Devices' design, marketing or sale, and/or to contacting PolyTech. This included Vince Testa, who attended internal meetings on foam degradation issues and who was then designated as a point of contact for PolyTech as a follow-up to those meetings.

      c.    Establishing these regular points of contact further organized the Enterprise.

428.    The RICO Defendants were aware of the other member's involvement with the Enterprise and aided its purposes by conducting illegal and fraudulent acts, i.e., mail and wire fraud. Accordingly, each member of the Enterprise benefited from the involvement and existence of the others.

D.    The RICO Defendants Committed at least Two Predicate Acts of Mail and Wire Fraud in Furtherance of the Enterprise's Fraudulent Scheme.

429.    The RICO Defendants devised a scheme for the purpose of defrauding consumers, prescribers, third-party payors, hospitals, and the FDA by falsely concealing or minimizing defects in the Recalled Devices.

430.    In addition, the RICO Defendants devised an illicit scheme for the purpose of obtaining money by fraudulent pretenses to maximize sales of the Recalled Devices. This scheme ultimately financially enriched the RICO Defendants.

431.    In furtherance of the scheme, the RICO Defendants knowingly conducted or participated, directly or indirectly, in the Philips-PolyTech Enterprise through racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, the RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity within the past ten years, therefore constituting a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels and employees of the Philips-PolyTech Enterprise, the U.S. Mail and interstate wire facilities. The RICO Defendants participated in the scheme to defraud by using mail, telephones and Internet to transmit mailings and wires in interstate or foreign commerce.

432.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the enterprise's objectives through misrepresentations, concealments, and material omissions.

433.    The RICO Defendants caused such mailings and uses of the wire to be made either by directly making or approving certain fraudulent statements or by setting in motion a scheme to defraud that would

reasonably lead to those mailings and wirings. These multiple acts of racketeering activity were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

434. The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.    Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Recalled Devices by means of false pretenses, misrepresentations, promises, and omissions.

b.    Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

435. The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent in furtherance and as a result of the RICO Defendants' illegal scheme to defraud:

a.    Shipments by Philips of the Recalled Devices, known to be defective, to locations throughout the United States for distribution and sale. Plaintiff do not have access to the confidential records that provide the precise dates and locations of these shipments, which occurred in each year between 2015-2021. The Recalled Devices transported in interstate commerce were misbranded, in violation of 21 U.S.C. § 352.

b.    Shipments from PolyTech to Philips (including via Paramount Die) of the PE-PUR foam for installation in the Recalled Devices, knowing that Philips would use the foam in the defective Recalled Devices and distribute the Recalled Devices throughout the United States using interstate carriers. Plaintiff do not have access to the confidential records that provide the

81

precise dates and locations of these shipments, which occurred in each year between 2015-2021.

c.  Shipments by Burnett of bulk PE-PUR foam sheets by private or commercial interstate carrier to PolyTech for use in the Recalled Devices. PolyTech caused Burnett to make these shipments when it ordered the bulk foam, knowing it would then transmit the foam for installation in the Recalled Devices. Plaintiff do not have access to the confidential records that provide the precise dates and locations of these shipments, which occurred in each year between 2015-2021. Documents provided to date from Burnett provide the particulars of at least one such shipment, which originated from Burnett in Baltimore, Maryland and was shipped to PolyTech in Newark, Delaware, on or about March 12, 2021.

d.  Advertisements, brochures, labeling, and marketing from Philips that omitted the known health and safety risks of the Recalled Devices, distributed using mail, wire, radio, or television communications in interstate commerce. This includes transmission of statements from Philips that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind" and the numerous other misrepresentations related to safety and efficacy cited above. Each such mailed advertisement—including brochures or print advertisements—violated the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). Philips knew its advertisements about the Recalled Devices were misleading and omitted material information, but still disseminated the advertisements to ensure the continued prescription and sale of the Recalled Devices. e. Advertisements and marketing from PolyTech for the PE-PUR foam used in the Recalled Devices, including marketing that falsely misrepresented the foam to have "superior physical properties and offer excellent resistance to heat, moisture, and chemicals." Each such mailed advertisement was a violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). PolyTech knew its advertisements were misleading and omitted material

information, but still disseminated the advertisements to ensure the continued prescription and sale of the Recalled Devices.

f.    Documents necessary to facilitate the sale and transmission of bulk PE-PUR foam from Burnett for use in the Recalled Devices, including invoices, packing lists, labels, invoices, and test reports. Each RICO Defendant knew that these documents would foreseeably result in the manufacture and sale of the Recalled Devices, thereby furthering the scheme to continue to make and sell them without disclosing the defect.

g.    Documents necessary to facilitate the manufacture and sale of the Recalled Devices, including bills of lading, invoices, shipping records, reports and correspondence. Each of the RICO Defendants knew that these documents would foreseeably result in the manufacture and sale of the Recalled Devices, thereby furthering the scheme to continue to make and sell them without disclosing the defect.

h.    Documents necessary to process and receive payment for the Recalled Devices by unsuspecting Plaintiff and Class members, including invoices and receipts. Each of the RICO Defendants knew that these documents were the foreseeable result of the manufacture and sale of the Recalled Devices, thereby furthering their scheme to continue to make and sell them without disclosing the defect.

i.    False or misleading communications, internally to Philips and PolyTech and externally with third parties including Burnett, that obscured the defect and prevented regulators and the public from discovering the true risks of the Recalled Devices, and/or purposely misidentified the cause of issues in the Recalled Devices to external factors, such as ozone cleaners.

j.    While using mail and wire to defraud and obtain revenue under false pretenses, Philips and PolyTech failed to timely, accurately, and completely disclose the defect and associated risks in the Recalled Devices when Philips and PolyTech had a duty to disclose this information.

83

436.    The RICO Defendants (or their agents), in furtherance of their illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Recalled Devices and related documents and communications. Because the RICO Defendants disguised their participation in the Enterprise, and worked to keep the Enterprise's existence secret so as to give the false impression that the Recalled Devices were safe, many of the precise dates of the Enterprise's use of U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the RICO Defendants' records. Indeed, an essential part of the successful operation of the Philips-PolyTech Enterprise alleged herein depended upon secrecy. However, Plaintiff describe occasions on which the RICO Defendants disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiff, and how those acts advanced the scheme. These disseminations include:

| FROM | TO | DATE | DESCRIPTION |
|---|---|---|---|
| Philips | PolyTech | 10/30/2015 | Email message from Philips to PolyTech sharing information and implying that a customer made Philips aware of PE- PUR foam degradation issues. |
| PolyTech | Burnett | 10/30/2015 | Email message from PolyTech to Burnett transmitting information from Philips about PE-PUR foam degradation issues. |
| Philips entity | Philips | 11/25/2015 | Communications transmitting information about a preventative maintenance servicing procedure implemented on Trilogy devices by a Philips entity, which resulted in no documented further investigation, risk analysis, or design review. |
| Bob Marsh, PolyTech | Lee Lawler, Burnett | 08/05/2016 | Email message from Bob Marsh of PolyTech to Lee Lawler of Burnett, referring to questions from Philips, and admitting that PolyTech would inform Philips of risks of PE- PUR foam raised by Burnett in 2016. |

| Philips | | Between 04/01/2016 and 01/22/2021 | Documents and communications sharing results of at least fourteen instances, assessments, and/or test reports, where Philips was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices. |
|---|---|---|---|
| Vincent Testa, Philips | Bonnie Peterson, PolyTech | 04/20/2018 | Email reporting consumer complaints that PE-PUR foam in Trilogy devices was "disintegrating" and admitting it was a "potential safety concern." |
| Bob Marsh, PolyTech | Lee Lawler, Burnett | 04/23/2018 | Email correspondence regarding degradation of ester foam, and forwarding email from Vince Testa of Philips regarding the same. |
| Bob Marsh, PolyTech (with Bonnie Peterson and Mike Haupt, PolyTech) | Lee Lawler, Burnett | Between 05/02/2018 and 05/04/2018 | Email correspondence confirming Philips' test results for ether vs. ester foam confirming that ether was the "better performer" but nonetheless raising Philips' and PolyTech's plan to continue using ester foam. |
| Philips | | 05/22/2018 | Communications to prepare Philips' Biological Risk Assessment document, which was deemed "inadequate" by the FDA because it did not "accurately reflect known data" about PE-PUR foam degradation in Trilogy ventilator devices. |
| Philips | | 05/2018 | Communications to prepare Philips' Health Hazard Evaluation, ER22227646, which was deemed "inadequate" by the FDA because it did not "accurately reflect known data" about PE- PUR foam degradation in Trilogy ventilator devices. |
| Philips | | 06/2018 | Communications to close CAPA INV 0988 related to Trilogy Devices without reference to other CPAP and BiPAP devices, including the Recalled Devices despite knowledge of consumer complaints of foam degradation in those devices. |

| Philips | | 08/24/2018 | Intra-company email amongst Philips personnel discussing testing that confirmed that the affected foam breaks down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints received. |
|---------|---|------------|---|
| Philips | | 12/12/2018 | Communications transmitting test results that acknowledged a "problem of degradation" in PE-PUR foam in Trilogy devices as a result of field reports/complaints, following which "no further design change, corrective action, or field correction was conducted" for the Recalled Devices for at least three years. |
| Philips | | 06/2019 | Documents and communications for inadequate formal CAPA 7211 investigation that excluded known medical device reports and complaints. |
| Philips | | 04/26/2021 | Press release admitting to serious health risks of the Recalled Devices but misleadingly casting blame on other "factors" such as ozone cleaners. |

437. Each of the predicate acts detailed above had the common purpose of generating significant revenue and profits for the RICO Defendants from the sale of Recalled Devices. This was accomplished concealing from patients, prescribers, third-party payors, and the FDA the true health risks and the safety defect associated with the Recalled Devices and their PE-PUR foam. Further, this common purpose was served by the above-described instances of RICO Defendants sharing information and evidence about the Defect among the Enterprise. This sharing of information allowed for the RICO Defendants to coordinate in their actions and efforts to conceal.

438. The RICO Defendants' pattern of racketeering activity alleged herein and the Philips-PolyTech Enterprise are separate and distinct from each other. Likewise, the RICO Defendants are distinct from the Enterprise.

439. The racketeering activities conducted by the RICO Defendants amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and Plaintiff. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the RICO Defendants was related, had similar intended purposes, involved similar participants and methods

86

of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators and Plaintiff. The RICO Defendants have engaged in this pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

440.   Each of the RICO Defendants aided and abetted. others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

441.   As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted various unlawful activities, each conducted with the common purpose of obtaining revenue from the marketing and sale of the defective Recalled Devices. The predicate acts also had the same or similar results, participants, targeted pool of victims, and methods of commission. The predicate acts were related and not isolated.

E.   The RICO Defendants Advanced their Fraudulent Scheme by Concealing Material Information about Serious Safety Risks Posed by the Recalled Devices that They Had a Duty to Disclose.

442.   The uses of mail and wire described above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to mislead consumers, prescribers, third party payors, hospitals, and the FDA about the Recalled Devices.

443.   In addition, these same uses of mail and wire were illegal because, when they sent or caused to be sent, RICO Defendants had duties to disclose the health and safety risks associated with the Recalled Devices. The RICO Defendants failed to disclose this critical information in order to advance their scheme.

444.   For years, the RICO Defendants each knew of the risks and safety concerns in the Recalled Devices. Specifically, Philips and PolyTech knew at least as early as 2015—six years before a public recall announcement—about foam degradation issues in PE-PUR foam in the field. To further the goals of the Philips-PolyTech Enterprise and to their mutual monetary gain, the RICO Defendants failed to disclose the existence, scope, and material safety risks of the defect in the Recalled Devices, and continued to manufacture and sell them for years in spite of that knowledge.

445.   The RICO Defendants' careful efforts to conceal the risks of the Recalled Devices were critically important to the viability of their

scheme. A decision by any one RICO Defendant to tell the truth about the defect would have been an existential threat to the Enterprise. Instead, each RICO Defendant kept key information about the risks of the Recalled Devices and known issues hidden for years. This omission of material facts about the Defect occurred because it advanced the RICO Defendants' scheme to sell defective Recalled Devices and avoid costly recalls and reputational harms.

446. The RICO Defendants' failure to disclose the known safety risks given the defect in the Recalled Devices violated several independent duties to disclose.

   a.  As a medical device manufacturer, Philips had a duty to disclose material facts about the safety risks of its devices to physicians, patients, and the FDA. This includes Philips' statutory and regulatory duties pursuant to 21 U.S.C. § 352 (FDCA); 21 C.F.R. § 820.70 and 21 C.F.R. § 803.

   b.  The RICO Defendants also each had a duty to disclose the defect in the Recalled Devices because of their exclusive knowledge and far superior information in their possession. The RICO Defendants knew about the risks to users of the Recalled Devices due to the PE-PUR foam, which they gathered through their exclusive access to information about their design, development, and testing, and through their confidential and proprietary investigations following consumer complaints. Plaintiff, by contrast, lack the sophisticated expertise that would be necessary to discover the defect and its implications on their own.

   c.  The RICO Defendants' affirmative steps to conceal the defect deprived Plaintiff and Class Members from an opportunity that otherwise could have led to their discovery of the truth. Philips and PolyTech also each had a duty to disclose because of the actions they took to conceal the Defect which was a material fact, in the Recalled Devices. Philips acted to suppress the truth including when it inappropriately limited and closed its CAPA investigations (thus avoiding a written record), omitted relevant data from its Biological Risk Assessments, and attempted to blame independent factors such as ozone cleaners for the defect. PolyTech, for its part, suppressed the truth when it corresponded with Burnett about the known risks of

PE-PUR foam and took no action, instead continuing to supply the foam to Philips for use in the Recalled Devices.

d.    Finally, Philips affirmatively disclosed information about the Recalled Devices such as the information discussed in ¶¶ 214 and 215 above. Because Philips opted to make these representations, and because it knew other information about the Recalled Devices that made those representations misleading or untrue, Philips was under a separate duty to disclose the full truth about the defect that materially qualified the information it provided.

447.    The RICO Defendants knew and intended that Plaintiff would rely on their and the other Enterprise members' material omissions when they paid for and used the Recalled Devices. Plaintiff' reliance on this concealment is demonstrated by the fact that they paid money for defective Recalled Devices that never should have been introduced into the U.S. stream of commerce.

F.    The Philips-PolyTech Enterprise's Pattern of Rackerteering Injured Plaintiff in their Business or Property When They Paid for the Defective Recalled Devices.

448.    Plaintiff and Nationwide Class members are "person[s] injured in his or her business or property" by reason of the Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c). Plaintiff and Nationwide Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

449.    Because of the Philips-PolyTech Enterprise's pattern of racketeering activity, Plaintiff and Nationwide Class members have been injured in their business and/or property by paying for Recalled Devices with an undisclosed safety defect. Because of this Defect, Plaintiff paid money for Recalled Devices that had no actual value at the time of purchase.

450.    As such, the Philips-PolyTech Enterprise directly or indirectly obtained money from Plaintiff and the Nationwide Class by means of materially false or fraudulent misrepresentations and omissions of material facts. Had the Plaintiff and Class members known what the RICO Defendants knew about the Recalled Devices, they would not have paid for the Recalled Devices.

451.   The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused injury to Plaintiff and Nationwide Class members' business and property. The RICO Defendants' pattern of racketeering activity logically, substantially, and foreseeably caused third party payors, hospitals, and consumers to purchase the Recalled Devices.

452.   The injuries suffered by the Plaintiff and Nationwide Class members' injuries were not unexpected, unforeseen, or independent. Rather, the RICO Defendants knew that the Recalled Devices were defective and unsafe. Regardless of these known risks, the RICO Defendants used mail and wires to carry out their scheme of deception, thereby reaping increased profits.

453.   Had the RICO Defendants disclosed their knowledge of the defects in the Recalled Devices and informed the FDA and the public, Plaintiff would have learned of the disclosure and made informed decisions about their health.

   a.   Had any of the RICO Defendants disclosed the Recalled Devices' defective condition to the FDA, the FDA would have considered the information material, and would have informed consumers. This is evidenced by the FDA's classification of the recall as Class I after Philips ultimately disclosed the defect it had long concealed.

   b.   Had the RICO Defendants disclosed the Recalled Devices' defective condition to the public, either through press releases, their websites, or in any other public forum, Plaintiff and Nationwide Class members would have learned of the Defect. Further, given the seriousness of the information and the number of devices impacted, the news media and consumer forums would have published this information.

   c.   Had the RICO Defendants disclosed the defective nature of the defect via any of the channels typically used to communicate information about the Recalled Devices, Plaintiff and Nationwide Class members would have learned about the Defect.

454.   The Enterprise's misleading statements and omissions to the FDA and to prescribers were essential to the scheme. The FDA would have considered information about the defective PE-PUR foam material (as evidenced by its Class I classification of the ongoing

recall), and prescribers would not have prescribed dangerous and defective breathing machines to their patients. At the very least, the RICO Defendants' misleading statements delayed the FDA's broader investigation of the Recalled Devices.

455.    In the case of fraud on third parties (i.e., the FDA and prescribers), the RICO Defendants' omissions and misrepresentations to third parties facilitated Plaintiff and Nationwide Class members' purchase of unsafe products that should not have been on the market. The FDA and prescribers have not suffered any direct injury as a result of the RICO Defendants' violations.

456.    As the purchasers and users of the Recalled Devices, Plaintiff is most affected by the RICO Defendants' misconduct. The RICO Defendants knew that their concealment of the risks would cause Plaintiff and the Nationwide Class to pay for the Recalled Devices and to suffer the attendant harm and safety risks of breathing through machines with potentially toxic foam.

457.    In light of the above, Plaintiff seeks actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

XIII.    VIOLATIONS    OF    THE    RACKETEER    INFLUENCED    CORRUPT ORGANIZATIONS ("RICO") ACT,

458.    Plaintiff reallege and incorporate by reference all preceding allegations as though fully set forth herein.

459.    This claim is brought by Plaintiff against Philips and PolyTech (within this claim, the "RICO Defendant(s)") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

460.    Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as he was injured in his business and/or property "by reason of" the RICO Act violations described herein.

461.    It is unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). See 18 U.S.C. § 1962(d). A defendant who "agreed to facilitate a scheme" violates section 1962(d) even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." Salinas v. United States, 522 U.S. 52, 65-66 (1997).

462.   The RICO Defendants have undertaken the practices described herein as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants agreed to facilitate the operation of the Enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), as described herein. The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described in the previous Count through a pattern of racketeering activity. The RICO Defendants conspired with the Enterprise participants to manufacture, sell, and profit from the Recalled Devices while concealing their health and safety risks. The conspiracy is coterminous with the time period in which the Enterprise has existed, beginning in or about 2015 and continuing to this day.

463.   The words, actions, or interdependence of activities of each RICO Defendant supports the inference of their agreement. Put another way, the RICO Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise, as detailed above in relation to the RICO Defendants' substantive violation of Section 1962(c).

464.   The RICO Defendants' acts in furtherance of the conspiracy include each of the predicate acts underlying the RICO Defendants' violations of Section 1962(c), as described above. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the members of the Enterprise in these offenses and furthered the conspiracy to conceal the health and safety risks in the Recalled Devices to increase or maintain revenue from their sale. The success of the Enterprise's fraudulent scheme depended upon the RICO Defendants' cooperation and agreement. These companies had to maintain strict confidentiality about the health and safety risks in the Recalled Devices or the scheme to continue. Even after earning about the health and safety risks associated with the PE-PUR foam used in the Recalled Devices, PolyTech continued to obtain the foam from Burnett and prepare it for use in the Recalled Devices. When doing so, PolyTech knew that Philips would manufacture and sell the Recalled Devices to Plaintiff without disclosing those risks. Likewise, Philips, with knowledge of the Defect, continued to place orders that would cause PolyTech to obtain and ship PE-PUR foam for use in the recalled devices.

465.   Philips depended upon PolyTech for the sourcing, cutting, and acquisition of the PE-PUR foam for the Recalled Devices, and for coordinating with Burnett to do so. On the other hand, PolyTech depended upon Philips for a viable path to profit from sale of the

Recalled Devices. This interdependence evidences the agreement to further the fraudulent scheme.

466.   Where a RICO Defendant did not commit a predicate act itself, it is sufficient if it was aware of the essential nature and scope of the Enterprise such that it agreed to the commission of the foreseeable predicate acts to advance the Enterprise's goals. The actions detailed above and throughout the Complaint as to each member of the Enterprise were foreseeable to the other members of the Philips-PolyTech Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

467.   Philips and PolyTech each violated 18 U.S.C. § 1962(d) and injured the business or property of Plaintiff. The RICO Defendants' violations of 18 U.S.C. § 1962(d) caused the same injuries and damages described in the prior Count. This Count incorporates by reference the allegations as to injury, damages, and causation from the prior Count. Plaintiff claim damages for himself under 18 U.S.C. § 1964(c).

XIV.   BATTERY.

468.   Plaintiff re-alleges and incorporates by reference the allegations set forth throughout the Complaint as if set forth herein.

469.   Philips engaged in acts that resulted in harmful and offensive contact with Plaintiff.

470.   Plaintiff each used a Recalled Device and unknowingly had unwanted and dangerous particles and gases blown into their bodies, including into their respiratory systems.

471.   Philips designed, manufactured, marketed, and sold the Recalled Devices with the defects discussed herein including foam degradation and resulting off-gassing. Thus, Philips did acts that caused the harmful and offensive touching of Plaintiff to occur.

472.   The acts engaged in by Philips that caused the unwanted and dangerous particles and gases to touch and enter Plaintiff' bodies were all done intentionally, and with full knowledge that they would result in harmful and offensive contact.

473.   The touching was harmful and offensive to Plaintiff because they are dangerous and can cause serious health problems. Any reasonable person in Plaintiff' situation would have been offended by the touching under the circumstances.

474. Plaintiff did not consent to the touching. Any ostensible "consent" provided was not done knowingly and was otherwise vitiated under the circumstances and not effective.

475. Plaintiff agreed to use the Recalled Devices and have air circulated through their respiratory systems, but, as alleged herein, they each did so without knowledge of the dangerous particles and gases caused by the Defect in the Recalled Devices.

476. As alleged herein, Philips knew about the Defect and that it was substantially certain to result in the harmful touching of Plaintiff. Despite this knowledge, Philips did not disclose the Defect to Plaintiff, their doctors, the FDA, or others.

477. As alleged herein, while Philips knew of the Defect for many years, Philips failed to disclose and concealed it from Plaintiff and the public. Philips thus knew the offensive touching would occur and that Plaintiff were under the mistaken impression that the products were safe and that no such offensive touching would occur.

478. Philips willfully, knowingly and tortiously battered Plaintiff.

479. Plaintiff was harmed and injured by this harmful and offensive touching.

480. As a foreseeable, proximate, and direct result of Philips' conduct, Plaintiff each have suffered a battery and have been damaged and by invasion of their privacy and bodily integrity without their consent, severe emotional stress and anxiety, and harm to their human dignity and corresponding damages therefrom.

481. Plaintiff demands judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

XV.   PUNITIVE DAMAGES.

482. Plaintiff re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

483. Philips' and PolyTech's conduct as set forth herein constitutes intentional, fraudulent, malicious and/or reckless conduct; and wanton and willful disregard of the rights and health of the Plaintiff.

484. Plaintiff is thus entitled to punitive damages.

485. Plaintiff demands judgment against Philips and PolyTech and request punitive damages, and such other relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff request that this Court:

A.    Award all damages to which Plaintiff are entitled (including, without limitation, compensatory damages for pain and suffering, emotional distress damages, past and future medical expenses, past and future loss of wages and wage earning capacity, and other economic damages; loss of consortium, medical monitoring; statutory damages; punitive, exemplary and treble damages; and loss of services, support and consortium);

B.    Award pre-judgment and post-judgment interest on such monetary relief;

C.    Award reasonable attorneys' fees and costs; and

D.    Grant such further and other relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 1, 2023.                Respectfully Submitted,

**DERRICK MARTIN KING**
1445 Crestview Avenue
Akron, Ohio 44320-4049
Phone: (330) 867-3979
Email: dmking12370@hotmail.com

*Pro se Plaintiff*

95

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *First Amended Complaint for Personal Injuries and Monetary Damages* was sent via electronic mail service to the following persons:

Wendy West Feinstein
John P. Lavelle, Jr.
MORGAN, LEWIS & BOCKIUS LLP
wendy.feinstein@morganlewis.com
john.lavelle@morganlewis.com

Attorney for Defendant *Philips RS North America LLC*

William B. Monahan
Michael H. Steinburg
SULLIVAN & CROMWELL LLP
monahanw@sullcrom.com
steinbergm@sullcrom.com

*Attorneys for Defendants Koninklijke Philips N.V., Philps North America LLC, Philips Holding USA, and Philips RS Holding Corporation*

Eric Scott Thompson
FRANKLIN & PROKOPIK
ethompson@fandpnet.com

*Counsel for Defendants Polymer Technologies Inc, Polymer Technologies Inc Molded Products Division, and Polymer Technologies Inc Elastometric Solutions Division*

**DERRICK MARTIN KING**

## PRAECIPE TO THE CLERK OF COURTS

Plaintiff requests that the Clerk serve a copy of the *Summons, Complaint,* and *First Amended Complaint* upon all parties via Certified U.S. Mail and addressed as follows:

**KONINKLIJKE PHILIPS N.V**
Philips Center
Amstelplein 2
1096 BC Amsterdam
The Netherlands

**PHILIPS NORTH AMERICA LLC**
c/o Corporation Service Company, S/A
251 Little Falls Drive
Wilmington, Delaware 19808-1674

**PHILIPS HOLDING USA**
c/o Corporation Service Company, S/A
251 Little Falls Drive
Wilmington, Delaware 19808-1674

**PHILIPS RS NORTH AMERICA LLC**
c/o Corporation Service Company, S/A
251 Little Falls Drive
Wilmington, Delaware 19808-1674

**PHILIPS RS HOLDING CORPORATION**
c/o Corporation Service Company, S/A
251 Little Falls Drive
Wilmington, Delaware 19808-1674

**POLYMER TECHNOLOGIES INC**
420 Corporate Boulevard
New Castle, Delaware 19702-3330

**POLYMER MOLDED PRODUCTS LLC**
c/o Benjamin Prybutok, S/A
3 Horseshoe Drive
Mount Laurel, New Jersey 08054-3055

Dated: November 1, 2023.

Respectfully Submitted,

**DERRICK MARTIN KING**
1445 Crestview Avenue
Akron, Ohio 44320-4049
Phone: (330) 867-3979
Email: dmking12370@hotmail.com

*Pro se Plaintiff*